Filed 6/24/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| LOS ANGELES COUNTY EMPLOYEES RETIREMENT ASSOCIATION, | B326977 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 21STCP03475) |
| v. | |
| COUNTY OF LOS ANGELES et al., | |
| Defendants and Respondents. | |

     APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Reversed.

     Latham & Watkins, Manuel A. Abascal, Nicholas Rosellini, and Roman Martinez for Plaintiff and Appellant.

     Hanson Bridgett, Raymond F. Lynch, Judith W. Boyette, and Matthew J. Peck for Board of Retirement of the San Bernardino County Employees' Retirement Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Benedon & Serlin, Judith E. Posner and Wendy S. Albers for Coalition of County Unions as Amicus Curiae on behalf of Plaintiff and Appellant.

Law Office of Michael A. Conger and Michael A. Conger for Retired Employees of Los Angeles County as Amicus Curiae on behalf of Plaintiff and Appellant.

Jeff Rieger for Board of Retirement of the Alameda County Employees Retirement Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Renne Public Law Group, Linda M. Ross, Steve Cikes, and Ryan P. McGinley-Stempel for Defendants and Respondents.

Jennifer Bacon Henning for California State Association of Counties as Amicus Curiae on behalf of Defendants and Respondents.

## INTRODUCTION

This appeal presents two questions: First, does the fiduciary board of a county public employee retirement system established under the County Employees Retirement Law of 1937 (Gov. Code, § 31450 et seq. (CERL))[1] have authority under the California Constitution and relevant statutes to create employment classifications and set salaries for employees of the retirement system? Second, does section 31522.1 impose a ministerial duty on a county board of supervisors to include in the county's employment classifications and salary ordinance the classifications and salaries adopted by the board of a county public employee retirement system for employees of that system? It will take some time and space to explain our answers to these

---

[1] Undesignated statutory references are to the Government Code.

questions.  In the meantime, here's the short version:  Yes and yes.

In 1992 the voters gave governing boards of public employee retirement systems "plenary authority and fiduciary responsibility for investment of moneys and administration of the system."  (Cal. Const., art. XVI, § 17, added by initiative, Gen. Elec. (Nov. 3, 1992), the California Pension Protection Act of 1992, known as Proposition 162 (Proposition 162).)  The voters also required the governing boards of retirement systems "to maximize the rate of return" while "defraying reasonable expenses of administering the system."  (*Id.*, subds. (b), (d).)  In enacting Proposition 162 the voters declared that, to "protect pension systems, retirement board trustees must be free from political meddling and intimidation."  (Ballot Pamp., Gen. Elec. (Nov. 3, 1992) text of Prop. 162, p. 70, § 2, subd. (f) (1992 Ballot Pamp.).)  The voters intended Proposition 162 to "give the sole and exclusive power over the management and investment of public pension funds to the retirement boards," to "strictly limit the Legislature's power over such funds," and to "prohibit the Governor or any executive or legislative body of any political subdivision of this state from tampering with public pension funds."  (*Id.*, p. 70, § 3, subd. (e).)

Proposition 162 expanded the authority granted to governing boards of county retirement systems under CERL to manage their systems and, for boards that agreed to pay administrative costs out of retirement system funds, to establish annual budgets and to appoint their own staff.  (See §§ 31522.1, 31580.)  Thus, the management of pension fund assets for such boards includes expenditures for salaries and benefits for retirement system employees.  Following Proposition 162,

3

retirement boards that appoint their own staff may incur only "reasonable expenses" in fulfilling their "sole and exclusive fiduciary responsibility over [system] assets" and their duties "to minimize the risk of loss and to maximize the rate of return." (Cal. Const., art. XVI, § 17, subds. (a), (d).)

Under CERL the governing boards of the Los Angeles County Employees Retirement Association (LACERA) budget and pay for LACERA's staff out of system assets. In 1996 Los Angeles County and its Board of Supervisors agreed with LACERA that Proposition 162 gave LACERA authority to create employment classifications and set salaries for LACERA employees. The County also agreed "the Board of Supervisors has a ministerial duty [under section 31522.1] to adopt an ordinance implementing classification and compensation changes adopted by LACERA for its employees." For two decades LACERA's Board of Retirement and its Board of Investments (collectively, the LACERA Boards) determined which positions were necessary to satisfy their fiduciary responsibilities under Proposition 162, created employment classifications to reflect the requisite qualifications and responsibilities for such positions, and set salary ranges to recruit and retain persons to fill those positions, while the Board of Supervisors implemented the LACERA Boards' decisions.

In 2018, however, something happened. The Board of Supervisors began rejecting certain employment classifications and salaries the LACERA Boards had adopted for LACERA employees. The Board of Supervisors cited a 15-year-old decision, *Westly v. Board of Administration* (2003) 105 Cal.App.4th 1095 (*Westly*), which held the broad authority Proposition 162 granted to retirement boards was not broad enough to give the governing

4

board of the state public employees retirement system the power to establish employment classifications and set salaries for its employees. The Board of Supervisors also cited the need "for alignment with the existing LACERA and County organizational structure."

The standoff between the Board of Supervisors and the LACERA Boards prevented LACERA from hiring and compensating certain employees the LACERA Boards deemed necessary to fulfill their fiduciary duties under Proposition 162 and ultimately caused LACERA to file this action for declaratory relief and a writ of mandate. Following *Westly*, the trial court denied LACERA's request for declaratory relief and its petition for a writ of mandate to require the Board of Supervisors to adopt the LACERA Boards' employment classifications and salaries for LACERA employees.

Unlike the trial court, we are not bound by the court's decision in *Westly*. Which is a good thing, because we conclude that decision is inconsistent with the language, purpose, and intent of Proposition 162. We also conclude section 31522.1 imposes on a county board of supervisors a ministerial duty to include in "eligible lists created in accordance with the civil service or merit system rules of the county in which the retirement system governed by the boards is situated" the employment classifications adopted by a board of retirement or board of investment and to include in the county salary ordinance or resolution the salaries adopted by a board of retirement or board of investment. Without that mandate, a political subdivision such as a county can elevate its political priorities over the fiduciary duty of a retirement board to administer its system for the "exclusive purposes of providing benefits to

5

participants . . . and their beneficiaries and defraying reasonable expenses of administering the system."  (See Cal. Const., art. XVI, § 17, subd. (b).)  Because Proposition 162 does not allow that, we reverse the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *The Constitution Authorizes the Board of Supervisors To Govern the County Under a County Charter*

Let's start at the beginning.  The California Constitution divides the state into counties and allows the governing bodies of those counties to adopt a charter for their governance.  (Cal. Const., art. XI, §§ 1, 3; see *Dibb v. County of San Diego* (1994) 8 Cal.4th 1200, 1206.)  Los Angeles County is a "charter county" (*Dimon v. County of Los Angeles* (2008) 166 Cal.App.4th 1276, 1281 & fn. 7) governed by the Los Angeles County Board of Supervisors (L.A. County Charter, art. I, § 2; *id.*, art. II, § 4).

Article XI, section 4 of the California Constitution addresses the structure and operation of charter counties and grants charter counties a degree of "'home rule,' i.e., the authority of the people to create and operate their own local government and define the powers of that government, within the limits set out by the Constitution."  (*Dibb v. County of San Diego*, *supra*, 8 Cal.4th at p. 1206.)  "Consequently, '[w]hen a California County [such as Los Angeles County] adopts a charter, its provisions "are the law of the State and have the force and effect of legislative enactments."'"  (*Dimon v. County of Los Angeles*, *supra*, 166 Cal.App.4th at p. 1281-1282; accord, *Holmgren v. County of Los Angeles* (2008) 159 Cal.App.4th 593, 601; see *County of Riverside v. Superior Court* (2003) 30 Cal.4th 278, 285.)

6

Article XI, section 4 states county charters "shall provide for," among other things, the "fixing and regulation by governing bodies, by ordinance, of the appointment and number of assistants, deputies, clerks, attachés, and other persons to be employed, and for the prescribing and regulating by such bodies of the powers, duties, qualifications, and compensation of such persons, the times at which, and terms for which they shall be appointed, and the manner of their appointment and removal." (Cal. Const., art. XI, § 4, subd. (f).)  Under the home rule doctrine, "county charter provisions *concerning the operation of the county,* and specifically including the County's right to provide 'for the number, compensation, tenure, and appointment of employees' (that is, a county's core operations) trump conflicting state laws." (*Holmgren v. County of Los Angeles, supra,* 159 Cal.App.4th at p. 601; see *Dimon v. County of Los Angeles, supra,* 166 Cal.App.4th at p. 1281.)

Similarly, under the Charter of the County of Los Angeles, the Board of Supervisors has authority to "appoint all County officers other than elective officers, and all officers, assistants, deputies, clerks, attaches and employees whose appointment is not provided for by this Charter. . . .  The Board shall provide, by ordinance, for the compensation of elective officers and of its appointees, unless such compensation is otherwise fixed by this Charter."  (L.A. County Charter, art. III, § 11(1); see § 25300.) The Charter further provides the Board of Supervisors has the duty to "provide, by ordinance, for the number of assistants, deputies, clerks, attaches and other persons to be employed from time to time in the several offices and institutions of the County, and for their compensation and the times at which they shall be appointed."  (L.A. County Charter, art. III, § 11(3).)

Under the County Charter, the Board of Supervisors established the Civil Service Rules, which include a classification plan and a mechanism for setting salaries for County employees. (L.A. County Charter, art. IX, § 35; L.A. County Civ. Service Rules, L.A. County Code, tit. 5, appen. 1, rules 5.01(A), 5.03(D).)[2] According to the County, a "classification" is "'a set of individual positions, suitable for similar treatment with respect to pay, examination procedures, and work assignments that are clustered or grouped by virtue of the similarity of the nature of work performed, the level of job complexity and responsibility required, the knowledge, skill and ability requirements, and the working conditions.'" The County's chief executive officer, who is responsible for classifying all positions in the County, has issued policies regarding classification and compensation that, according to the County, "emphasiz[e] the civil service principle of 'equal pay for equal work.'" Regarding compensation, the County's chief executive officer submits any proposed changes to the Board of Supervisors to approve and include in its salary ordinance. (Rule 5.03(D).) "In fixing compensation to be paid to persons under the classified civil service, the Board of Supervisors shall be governed by applicable State statutes and County ordinances." (L.A. County Charter, art. X, § 47.)

B. *The Board of Supervisors Creates the Los Angeles County Retirement System*

CERL established "an optional employee pension system for county adoption." (*Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.* (2020) 9 Cal.5th 1032, 1055; see § 31500 [a board of supervisors may establish a

---

[2] References to rules are to the County Civil Service Rules.

8

retirement system under CERL by a four-fifths vote].)  The Board of Supervisors adopted the provisions of CERL shortly after it became law.[3]  (L.A. County Code, § 5.20.010.)  Los Angeles County established LACERA in 1947.  (*Howard Jarvis Taxpayers' Assn. v. Board of Supervisors* (1996) 41 Cal.App.4th 1363, 1373.)

CERL vests the management of a county employee retirement system in a board of retirement.  (§ 31520; *Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.*, *supra*, 9 Cal.5th at p. 1066.)  The county treasurer is one of five members of the board of retirement, the county board of supervisors selects two more members, and the remaining two are elected by the retirement association.  (See § 31530.)  In counties with retirement system assets that exceed $800,000,000, like Los Angeles County, the board of supervisors may establish a board of investments to manage investments of the retirement system.  (See § 31520.2.)  According to LACERA, its Board of Retirement generally administers and manages the retirement system, while its Board of Investments develops and implements LACERA's investment and actuarial policies and objectives.  Together the LACERA Boards develop and approve LACERA's budget, including the classification and salaries of its employees.

---

[3]     As of 2020, 20 of California's 58 counties had chosen to implement pension plans under CERL.  (*Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.*, *supra*, 9 Cal.5th at p. 1055.)  "The remaining counties either operate an independent retirement system or contract with the state's pension plan, the Public Employees' Retirement System." (*Ibid*.)

"A county retirement board . . . does not act as agent for the county, but as administrator of the county retirement system, an independent entity."  (*Traub v. Board of Retirement* (1983) 34 Cal.3d 793, 798; see *Hudson v. County of Los Angeles* (2014) 232 Cal.App.4th 392, 396, fn. 2 ["LACERA is a public retirement system independent from the County of Los Angeles"]; *Howard Jarvis Taxpayers' Assn. v. Board of Supervisors*, *supra*, 41 Cal.App.4th at p. 1373 [a "county Board of Retirement does not act as an agent for the county, but as an independent entity established pursuant to CERL"]; *Santa Barbara County Taxpayers Assn. v. County of Santa Barbara* (1987) 194 Cal.App.3d 674, 682 ["retirement boards . . . are independent from counties"].)  "The task of a county retirement board is not to design the county's pension plan but to implement the design enacted by the Legislature through CERL. . . .  Although CERL grants to retirement boards the power to make regulations, those regulations must be consistent with the provisions of CERL."  (*Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.*, *supra*, 9 Cal.5th at pp. 1066-1067; see § 31525 ["[t]he board may make regulations not inconsistent with this chapter"].)

> C.     *The Statutory and Constitutional Framework for the*
>        *Retirement System's Management*

> 1.     *CERL Gives Retirement Boards Responsibility*
>        *for Managing County Retirement Systems*

County retirement associations like LACERA "hold and invest the pensions and administer the benefits to the employees of the County . . . who are its members," and their retirement

10

boards are "charged with the responsibility of ascertaining the eligibility for and paying pension benefits to eligible employees under CERL." (*Weber v. Board of Retirement* (1998) 62 Cal.App.4th 1440, 1442; see *Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.*, *supra*, 9 Cal.5th at p. 1066 ["[a]s a practical matter, the retirement boards' responsibilities generally involve management of the system's financial assets [citation] and the processing and payment of claims for benefits under the plan"].) "Accordingly [CERL] makes the retirement board the body responsible for managing the retirement system." (*Corcoran v. Contra Costa County Employees Retirement Bd.* (1997) 60 Cal.App.4th 89, 94 (*Corcoran*); see § 31520).

Before 1973 county boards of supervisors and county treasurers supervised retirement board staff, and boards of supervisors appropriated county funds "to offset the administrative cost of the county's retirement system." (Assem. Retirement Com., Analysis of Assem. Bill No. 470 (1973-1974 Reg. Sess.), as introduced.) In 1973 the Legislature enacted Assembly Bill No. 470 (AB 470), which added two provisions to CERL "to permit the retirement board and the board of investment to appoint its own administrative, technical and clerical staff" and, in turn, to charge "the administrative cost of the retirement system . . . against the earnings of the retirement fund." (Assem. Retirement Com., Analysis of Assem. Bill No. 470.) One of those 1973 provisions, section 31522.1, along with Proposition 162, is at the heart of this action. Section 31522.1 states: "The board of retirement and both the board of retirement and the board of investment may appoint such administrative, technical, and clerical staff personnel as are

11

required to accomplish the necessary work of the boards. The appointments shall be made from eligible lists created in accordance with the civil service or merit system rules of the county in which the retirement system governed by the boards is situated. The personnel shall be county employees[4] and shall be subject to the county civil service or merit system rules and shall be included in the salary ordinance or resolution adopted by the board of supervisors for the compensation of county officers and employees."

The corollary to section 31522.1, section 31580.2, provides, as amended: "In counties in which the board of retirement, or the board of retirement and the board of investment, have appointed personnel pursuant to Section 31522.1 [and other sections applying to specific counties that were enacted after 1973], the respective board or boards shall annually adopt a budget covering the entire expense of administration of the retirement system, which expense shall be charged against the earnings of the retirement fund." (§ 31580.2, subd. (a).) Section 31580.2 limits LACERA's annual expenses to .021 percent of the accrued actuarial liability of the retirement system. (§ 31580.2, subd. (a)(1).)[5]

---

[4]     The Legislature added the language stating board of retirement personnel "shall be county employees" as a "nonsubstantive amendment" in 1984. (Off. of Employee Relations, Enrolled Bill Rep. on Assem. Bill No. 132 (1979-1980 Reg. Sess.) prepared for Governor Brown (May 8, 1979) p. 1.)

[5]     The cap on annual expenses was originally one-tenth of one percent of the total assets of the retirement system. (Stats. 1973, ch. 269, § 2.) The cap is now the greater of .021 percent of the

LACERA creates its budget and "covers" the administrative costs from revenues on the assets it manages (see § 31580.2), but LACERA "does not maintain a bank account independent of the county treasurer's office." (*Corcoran, supra*, 60 Cal.App.4th at p. 94.) Instead, "[c]hecks drawn on the retirement system require the signature of the county auditor or his [or her] designee." (*Ibid.*; see § 31590.)

"Funding for the system comes both from the governmental employers and from the employees on an actuarial basis, so that any adjudication of a claim for benefits may have economic impact upon the membership of the association as well as upon the treasury of the county and participating political entities." (*Traub v. Board of Retirement, supra*, 34 Cal.3d at p. 798; see *Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn., supra*, 9 Cal.5th at pp. 1055-1056 ["Both the county and its employees must make regular contributions to their plan's pension fund in amounts determined by the county board of supervisors, upon recommendation of the retirement board."]; see also §§ 31453-31454.6.) Section 31595, enacted in 1984, provides that the assets of a public pension or retirement system are "trust funds" held "for the exclusive purposes of providing benefits to participants in the pension or retirement system and their beneficiaries and defraying reasonable expenses of administering the system." Section 31595 further requires boards of retirement and their officers and employees to discharge their duties to the retirement system "[s]olely in the interest of, and for the exclusive purposes of

---

accrued actuarial liability of the retirement system and $2,000,000, as adjusted by the annual cost-of-living adjustment. (§ 31580.2, subd. (a).)

13

providing benefits to, participants and their beneficiaries, minimizing employer contributions thereto, and defraying reasonable expenses of administering the system," and "[w]ith the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with these matters would use in the conduct of an enterprise of a like character and with like aims."  (§ 31595, subds. (a)-(b).)

> 2.       *Proposition 162 Gives Retirement Boards "Plenary Authority" over the "Administration of the System"*

In response to state budget shortfalls in the early 1990's, the Legislature enacted several measures to delay state-paid employer contributions to the California Public Employees' Retirement System (CalPERS or PERS) for state employees.  (See *Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1119-1120; *Westly*, *supra*, 105 Cal.App.4th at p. 1100.)  As the court in *Westly* summarized:  "Until 1990, the state paid employer contributions on a monthly basis. [Citation.]  In 1990, the Legislature changed the payment schedule from monthly to quarterly.  In 1991, the Legislature temporarily changed the payment schedule from quarterly to semiannually.  In 1992 legislation 'changed the schedule to "semiannually, six months in arrears."  Legislation in 1993 changed the schedule to "annually, 12 months in arrears."' [Citation.]  In 1991, legislation was passed to repeal statutes providing for cost of living benefits to retirees, and to use these funds to meet the state's employer contribution requirement.  [Citation.]  Also in 1991, legislation was passed transferring the actuarial function to the Governor."

14

(*Westly*, at p. 1100; see *Wilson*, at pp. 1117-1119.)  Against this backdrop, the voters enacted Proposition 162 to amend Article XVI, section 17 of the California Constitution, which concerns public pension funds.  (See *Mijares v. Orange County Employees Retirement System* (2019) 32 Cal.App.5th 316, 331 [the voters enacted Proposition 162 "after the Legislature and Governor raided the county's retirement funds for other budget shortfalls"]; *City of San Diego v. San Diego City Employees' Retirement System* (2010) 186 Cal.App.4th 69, 79 [Proposition 162 "was intended to protect [retirement] boards from 'political meddling and intimidation' and to 'strictly limit the Legislature's power over such funds'"].)

Article XVI, section 17, "reached [its] current form through two ballot initiatives.  The first, Proposition 21, passed in 1984 in an apparent response to the emerging financial markets of the 1980's."  (*O'Neal v. Stanislaus County Employees' Retirement Assn.* (2017) 8 Cal.App.5th 1184, 1202 (*O'Neal*).)  "Proposition 21 introduced the principle that 'assets of a public pension or retirement system are trust funds' that 'shall be held for the exclusive purposes of providing benefits to participants in the pension or retirement system and their beneficiaries and defraying reasonable expenses of administering the system.'  In addition, it identified several ways in which the fiduciary of those trust funds must act.  These included that the fiduciary shall discharge his or her duties with respect to the system 'solely in the interest of, and for the exclusive purposes of providing benefits to, participants and their beneficiaries, minimizing employer contributions thereto, and defraying reasonable expenses of administering the system,' and 'with the care, skill, prudence, and diligence under the circumstances then prevailing

15

that a prudent person acting in a like capacity and familiar with these matters would use in the conduct of an enterprise of a like character and with like aims.'" (*O'Neal*, at p. 1202; see Ballot Pamp., Primary Elec. (June 5, 1984) text of Prop. 21, p. 25.)

The second, Proposition 162 (enacted in 1992) expanded the constitutional authority of retirement boards by granting them "plenary authority and fiduciary responsibility for investment of moneys and administration of the system." Proposition 162 made that authority "subject to" conditions listed in subdivisions (a) through (h) of that initiative, which incorporated and added to the duties and responsibilities of retirement boards set forth in Proposition 21. For example, Proposition 162, subdivision (a), in addition to retaining the language from Proposition 21 that the assets of a retirement system are "trust funds" held "for the exclusive purposes of providing benefits to participants . . . and their beneficiaries and defraying reasonable expenses of administering the system," added that retirement boards "shall have the sole and exclusive fiduciary responsibility over the assets" of the retirement system and the "sole and exclusive responsibility to administer the system in a manner that will assure prompt delivery of benefits and related services to the participants and their beneficiaries." (Cal. Const., art. XVI, § 17, subd. (a); *id.*, former art. XVI, § 17.)

Like Proposition 21, subdivision (b) of Proposition 162 provides that members of a retirement board must discharge their duties "solely in the interest of, and for the exclusive purposes of providing benefits to, participants and their beneficiaries, minimizing employer contributions thereto, and defraying reasonable expenses of administering the system." (Cal. Const., art. XVI, § 17, subd. (b).) But Proposition 162 added

16

a requirement that a board's duty to participants and their beneficiaries "shall take precedence over any other duty." (*Ibid*.) Also like Proposition 21, Proposition 162 requires retirement board members exercising a board's plenary authority to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with these matters would use in the conduct of an enterprise of a like character and with like aims." (*Id*., subd. (c).) And under Proposition 162 members of a retirement board must still "diversify the investments of the system so as to minimize the risk of loss and to maximize the rate of return, unless under the circumstances it is clearly not prudent to do so." (*Id*., subd. (d).)

Proposition 162 added other new conditions. Those conditions included that retirement boards, "consistent with the exclusive fiduciary responsibilities vested in [them], shall have the sole and exclusive power to provide for actuarial services in order to assure the competency of the assets of the public pension or retirement system" (Cal. Const., art. XVI, § 17, subd. (e)); that "the number, terms, and method of selection or removal of members of the retirement board . . . shall not be changed, amended, or modified by the Legislature" except in certain circumstances (*id*., subd. (f)); that the "Legislature may by statute continue to prohibit certain investments by a retirement board where it is in the public interest to do so, and provided that the prohibition satisfies the standards of fiduciary care and loyalty required of a retirement board pursuant to this section" (*id*., subd. (g)); and that "the term 'retirement board' shall mean the board of administration, board of trustees, board of directors, or other governing body or board of a public employees' pension

17

or retirement system; provided, however, that the term 'retirement board' shall not be interpreted to mean or include a governing body or board created after July 1, 1991 which does not administer pension or retirement benefits, or the elected legislative body of a jurisdiction which employs participants in a public employees' pension or retirement system" (*id.*, subd. (h)).

> D. *The LACERA Boards and the Board of Supervisors Agree Proposition 162 and CERL Give the LACERA Boards Authority To Establish Employment Classifications and Salaries for LACERA Employees*

The LACERA Boards began appointing their own staff and preparing and adopting LACERA's budget under sections 31522.1 and 31580.2 in 1978. It is unclear from the record whether the Boards established employment classifications and salaries for LACERA employees at that time.

In 1996 LACERA's Board of Investments requested a legal opinion from a law firm on the issue the parties in this case are now, almost 30 years later, litigating: whether section 31522.1 imposed a mandate on the Board of Supervisors to incorporate into the County eligibility list and salary ordinance the employment classifications and salaries adopted by the LACERA Boards. The law firm concluded section 31522.1 created that mandate, which Proposition 162 "re-emphasized" in 1992 by granting the Boards plenary authority over the administration of the retirement system. The law firm based its conclusion on the language of sections 31522.1 and 31580.2, the legislative history of AB 470, and LACERA's independence from the County. Regarding the statutory text, the law firm observed that "the independent budgetary authority given to the retirement boards

18

under [section 31580.2] would have little meaning if the boards could not control the compensation levels for its appointees." Regarding the legislative history of AB 470, the law firm concluded the committee reports showed the purpose of AB 470 was "to allow the retirement boards to hire their own staff, rather than continue to have to rely on staff responsible to the County Treasurer and the County Board of Supervisors." The law firm also cited the County's opposition to AB 470, which argued AB 470 "'would create two new units of county government [the Board of Retirement and the Board of Investments] with no cost controls as we now know them in county operations.'" The law firm explained the Legislature later amended section 31522.1 to specify that employees appointed by the Boards are "county employees" for the limited purpose of protecting retirement system employees under the Civil Service Rules.

The Board of Supervisors agreed with the law firm's assessment. In a letter to the County's chief administrative officer, County counsel stated "the Board of Supervisors has a ministerial duty to adopt an ordinance implementing classification and compensation changes adopted by LACERA for its employees." County counsel explained: "LACERA employees are subject to the civil service provisions of the County Charter and to the County's Civil Service Rules. They are not subject to the classification system maintained by the County for its employees, nor are classification actions affecting LACERA employees subject to the approval of the [County] Director of Personnel." County counsel stated that the Board of Supervisors had no "direct control" over the classification or pay rates for retirement system employees, but that the Board of Supervisors could seek judicial review if it believed the LACERA Boards had

19

abused their discretion.  County counsel agreed with the law firm's conclusion section 31522.1 designated retirement system employees as "county employees" to protect them under the Civil Service Rules and to allow them to participate in the retirement system and receive "County fringe benefits."

After 1996 the LACERA Boards approved employment classifications and salaries for LACERA employees and provided them to the Board of Supervisors, which, in turn, included the classifications and salaries in the County's eligibility list and salary ordinance.  It appears the LACERA Boards and the Board of Supervisors generally collaborated in these efforts to ensure LACERA's positions complied with civil service and other applicable rules.  For example, correspondence from LACERA to the Board of Supervisors in 2001 "requested" that the Board of Supervisors amend the County Code to include revised salary ranges for certain positions.  In 1999 the County removed retirement system employees from County bargaining units, recognizing "the LACERA Board of Retirement has sole authority to appoint and set salaries for [its] employees."  Following that action, LACERA formed new bargaining units and now bargains directly with its employees.  Employment classifications for LACERA employees in the Civil Service Rules are also separate from the classifications for County employees.  (L.A. County Code, ch. 6.127.)

But, after two decades of cooperation, something changed.

E.    *The Board of Supervisors Reverses Course in 2018*

As early as 2001 LACERA informed the Board of Supervisors that it faced a challenging recruiting environment for personnel who were qualified to oversee sophisticated

20

investments and maximize returns for members and their beneficiaries.  A letter from the assistant chief executive officer of LACERA to a member of the Board of Supervisors explained that LACERA intended to increase salaries for certain investment and management positions that were not comparable to any County positions and that LACERA competed to fill these positions with other public pension funds and private sector investment and law firms.

In 2016 and 2017 LACERA conducted a personnel review and concluded several new positions and salary adjustments were necessary to achieve LACERA's strategic priorities and fulfill its fiduciary duties to its members and beneficiaries.  Since the early 2000's, the assets LACERA managed had increased by 57 percent to $48 billion, and its staff had increased by 35 percent to almost 400 positions.[6]  Among the new positions proposed in 2017 were five new management classifications, including a deputy chief investment officer; a principal staff counsel; and six new information technology classifications.  LACERA advised the Board of Supervisors the new classifications would "provide the leadership necessary to support the development, implementation, and management of the organization's business processes and future requirements."  Based on its prior practice and expectation the Board of Supervisors would implement LACERA's personnel decisions, LACERA asked the Board of Supervisors to amend the salary ordinance to include the new positions and salary ranges.

But this time the Board of Supervisors refused to adopt the requested amendments to the salary ordinance.  In April 2018

---

[6]   According to LACERA, it managed over $72 billion in assets in 2023.

County counsel sent a letter to LACERA stating the California Constitution, relevant statutes, and the County Charter gave the Board of Supervisors, not LACERA, authority to establish salaries for LACERA's staff as "county employees." Despite 15 years of history to the contrary, County counsel informed LACERA Proposition 162 never took "salary-setting authority . . . from the [Board of Supervisors] in the first instance."

The County's change of position was based on *Westly*, *supra*, 105 Cal.App.4th 1095, which held in 2003 the "plenary authority" granted to retirement boards by Proposition 162 did not give the governing board of CalPERS authority to create classifications and establish salaries for its staff that violated certain relevant statutes. (*Westly*, at p. 1112.) The dispute in *Westly* arose when the CalPERS board, among other actions, sought to exempt portfolio managers from the state civil service system, despite statutes prohibiting those actions. (*Id.* at p. 1103.) Similar to the situation here, where from 1996 to 2018 the LACERA Boards and the Board of Supervisors agreed that the LACERA Boards had authority to establish employment classifications and compensation for LACERA employees, in *Westly* the CalPERS board and the Department of Personnel Administration agreed from 1992 (when Proposition 162 was enacted) to 2000 the CalPERS board had plenary authority under Proposition 162 "to appoint . . . exempt employees." (Assem. Com. on Public Employees and Retirement, 3d reading analysis of Sen. Bill No. 269 (2003-2004 Reg. Sess.) Sept. 9, 2003.) In 2000, however, the Department of Personnel Administration denied the CalPERS board's request to increase compensation for certain portfolio managers. (See *ibid.*) The court in *Westly* held that the CalPERS board's authority under Proposition 162 did

22

not include "the administration of personnel matters," such as compensation for CalPERS' employees, and that the authority Proposition 162 gave retirement boards was "limited to actuarial services and to the protection and delivery of the assets, benefits, and services for which the Board has a fiduciary responsibility." (*Westly*, at pp. 1110, 1112.)

Following the County counsel's position, the County chief executive officer stated in a May 2018 letter to the Board of Supervisors that she had evaluated the new positions proposed by LACERA "for alignment with the existing LACERA and County organizational structure." Based on that review, the County chief executive officer determined that numerous proposed positions were "not necessary" and that others merited lower salaries than those adopted by LACERA. In June 2018 the County drafted and adopted a salary ordinance for LACERA employees.

F. *LACERA Sues the County and Board of Supervisors*

For several years LACERA attempted to negotiate with the County over the positions the LACERA Boards approved in 2017 but could not fund without the Board of Supervisors amending the County's salary ordinance. In 2020 LACERA's chief executive officer sent a report to the County chief executive officer detailing LACERA's need for certain organizational and management changes to address strategic priorities, including accelerating LACERA's performance, enhancing efficiency and productivity, and improving member services. The report again recommended many of the personnel changes adopted by the LACERA Boards in 2017 but rejected by the Board of Supervisors.

Based on the 2020 report, the LACERA Boards approved and submitted to the Board of Supervisors to include in the 2021 County salary ordinance 11 classifications and salaries, including several originally deemed necessary in 2017. LACERA based the salary ranges on industry data, including salary comparisons with comparable positions for County employees, CalPERS, and other retirement systems in Southern California. The County chief executive officer approved the position for a deputy chief investment officer, but she recommended the Board of Supervisors reject most of the other positions, again citing the need to "maintain[ ] alignment and consistency with the County's compensation and classification plan." The Board of Supervisors followed the County chief executive officer's recommendations, rejected eight of the 11 proposed positions, and lowered the salaries for two of the three approved positions.

LACERA filed this action in October 2021 against the County and the Board of Supervisors, seeking a writ of mandate directing the Board of Supervisors to comply with section 31522.1 by adopting the salary ordinance proposed by LACERA. LACERA also sought a declaration that the LACERA Boards "have authority over LACERA's management and administration, which includes the authority to appoint and set classifications, titles, and salaries for the personnel LACERA needs to administer the retirement system, and that the County is obligated, and has a ministerial duty, to implement such personnel and salary decisions by including them in County salary ordinances."

LACERA alleged the "power to 'manage' the retirement system and to 'appoint' the personnel 'required to accomplish the necessary work'" granted by Proposition 162 and CERL

"inherently includes the power to determine which employee classifications will be created including the qualifications and duties of the persons employed in those classes, which employees report to whom, the salaries for those employees, and other terms and conditions of employment; otherwise, the power to appoint and to manage would be meaningless."  LACERA alleged "deciding which staff are needed, how those staff should be organized, and what salaries are necessary to recruit and incentivize those staff are all inherent to the power to manage and appoint personnel."  LACERA further alleged "[e]stablishing classifications and setting salaries is inherent to LACERA's ability to recruit, hire, and manage the staff necessary to administer the system."  LACERA's petition and complaint excerpted a letter from LACERA's chief executive officer to the Board of Supervisors stating the Board of Supervisors' refusal to amend the County salary ordinance as requested by the LACERA Boards "adversely affected the administration of the LACERA retirement system" by "limiting LACERA's ability to strategize, monitor and manage its investment portfolio, impairing LACERA's ability to support and provide services across all divisions of the fund, harming staff retention and morale, and making it difficult for LACERA to hire permanent staff who could assist with improving and ensuring information system security."

LACERA also alleged that the cost of salaries for LACERA employees is one of LACERA's largest budget items and that the County was "usurping the budget-making authority" section 31580.2 granted to the LACERA Boards by exerting control over the salaries of LACERA personnel.  LACERA further alleged such interference "forces" the LACERA Boards "to seek permission, and to take instruction, from the county before

25

making any classification and salary decisions," which conflicted with LACERA's fiduciary duty under Proposition 162 to administer the retirement system solely in the interests of participants and their beneficiaries.  As alleged by LACERA, its "Boards cannot simultaneously owe an exclusive duty solely to participants and beneficiaries while being subordinate to County executives, who have duties to the general population and elected officials."

G.    *Following (and Bound by)* Westly, *the Trial Court Enters Judgment for the County and the Board of Supervisors*

The trial court ruled against LACERA.  Citing *Westly*, the court ruled the plenary authority of LACERA's Boards is limited to managing the retirement system's "assets and their delivery to members and beneficiaries."  As a result, the court concluded, the LACERA Boards did not have authority under Proposition 162 to "classify its employees and set their salaries."

The trial court also ruled the Board of Supervisors "has constitutional, statutory, and Charter authority to set salaries for County employees."  The court found section 31522.1 was ambiguous regarding which body—the retirement board or the board of supervisors—"decides the job classification and compensation of [retirement system] personnel."  The court interpreted that ambiguity consistent with the court's interpretation of Proposition 162 in *Westly* and with the scope of authority the Board of Supervisors argued it had under the California Constitution and the County Charter.  Thus, the trial court concluded, "the proper construction of section 31522.1 permits LACERA to make recommendations to the Board of

26

Supervisors for job classification and employee compensation, but the Board of Supervisors does not have a ministerial duty to rubber stamp those requests in a salary ordinance." Instead, the court ruled, "LACERA's appointment power remains subject to the Board of Supervisors' constitutional and statutory authority to establish classifications and to fix compensation."

The trial court denied LACERA's petition for writ of mandate on December 22, 2022 and entered judgment for the County and the Board of Supervisors on January 23, 2023. As we discuss, LACERA timely appealed.

## DISCUSSION

A. *LACERA's Notice of Appeal Was Timely*

The County and Board of Supervisors state that they feel "obligated to raise one wrinkle regarding appealability" and that LACERA's appeal may be untimely because LACERA's notice of appeal identified only the judgment and not the order denying the petition for writ of mandate. (See *Meinhardt v. City of Sunnyvale* (2022) 76 Cal.App.5th 43, review granted June 15, 2022, S274147.) The trial court's order denying the petition for writ of mandate, however, directed the County to prepare the proposed judgment, serve it on counsel for LACERA, meet and confer over any objections, and submit the proposed judgment to the court with a declaration stating whether there were any unresolved objections. The court in *Meinhardt* acknowledged an order denying a petition for writ of mandate conclusively resolves an action and becomes appealable only where "such order contemplates the taking of no further action in the case." (*Id.* at p. 66.) Because the order in this case contemplated further action, it did not resolve all issues between the parties and was

27

not appealable.  (*Ibid.*; see *Dhillon v. John Muir Health* (2017) 2 Cal.5th 1109, 1115 [order denying a petition for writ of mandate is interlocutory where additional judicial action is required for a final determination of the rights of the parties]; *Laraway v. Pasadena Unified School Dist.* (2002) 98 Cal.App.4th 579, 583 [an order denying a petition for writ of mandate is not appealable if it contemplated further action, "such as the preparation of another order or judgment"].)

Moreover, even if the order denying the petition for writ of mandate were appealable, we would liberally construe the notice of appeal to include the order denying the petition for writ of mandate "'to protect the right of appeal if it is reasonably clear what appellant was trying to appeal from, and where the respondent could not possibly have been misled or prejudiced.'" (*Verceles v. Los Angeles Unified School Dist.* (2021) 63 Cal.App.5th 776, 783; see *Brown v. Municipal Court* (1978) 86 Cal.App.3d 357, 360, fn. 1 [liberally construing a notice of appeal to include a judgment following a minute order denying petition for writ of mandate but "authorizing a subsequent judgment"].)  The County and Board of Supervisors do not claim they were misled or suffered prejudice from LACERA's arguably incomplete notice of appeal.

> B.     *Applicable Law and Standard of Review*

"A writ of mandate under Code of Civil Procedure section 1085 is a legal tool to compel a public agency to perform a legal, typically ministerial, duty." (*California Privacy Protection Agency v. Superior Court* (2024) 99 Cal.App.5th 705, 721, fn. omitted; see *Alameda Health System v. Alameda County Employees' Retirement Assn.* (2024) 100 Cal.App.5th 1159, 1176-

28

1177; *Los Angeles Waterkeeper v. State Water Resources Control Bd.* (2023) 92 Cal.App.5th 230, 265.)  "A ministerial duty is an act that a public agency is required to perform in a prescribed manner under the mandate of legal authority without the exercise of judgment or opinion concerning the propriety of the act.  [Citation.]  Put another way, a ministerial act is one [w]here a statute or ordinance clearly defines the specific duties or course of conduct that a governing body must take, thus eliminat[ing] any element of discretion." (*California Privacy Protection Agency*, at p. 721, internal quotation marks omitted; see *Alameda Health System*, at p. 1177; *Los Angeles Waterkeeper*, at pp. 265-266.)  "The writ will issue against a county, city, or other public body, or against a public officer." (*Ochoa v. Anaheim City School Dist.* (2017) 11 Cal.App.5th 209, 223.)

"To obtain a writ of mandate, "'the petitioner must show there is no other plain, speedy, and adequate remedy; the respondent has a clear, present, and ministerial duty to act in a particular way; and the petitioner has a clear, present and beneficial right to performance of that duty.'"" (*California Privacy Protection Agency v. Superior Court, supra*, 99 Cal.App.5th at p. 721; see *Ochoa v. Anaheim City School Dist.*, *supra*, 11 Cal.App.5th at p. 223.)  The County and the Board of Supervisors did not argue in the trial court and do not argue on appeal that, even if the court adopted LACERA's interpretation of Proposition 162 and section 31522.1, LACERA failed to make the requisite showing to meet this standard.  (See *Schecter v. Los Angeles County* (1968) 258 Cal.App.2d 391, 393 [affirming a judgment granting a writ of mandate ordering the Board of Supervisors to amend a salary ordinance to implement an employment reclassification].)

29

"""In reviewing a judgment granting a writ of mandate, we apply the substantial evidence standard of review to the court's factual findings, but independently review its findings on legal issues. [Citation.]" [Citation.] "Where, as here, the facts are undisputed and the issue involves statutory interpretation, we exercise our independent judgment and review the matter de novo.""" (*California Privacy Protection Agency v. Superior Court*, *supra*, 99 Cal.App.5th at pp. 721-722; see *Ochoa v. Anaheim City School Dist.*, *supra*, 11 Cal.App.5th at pp. 223-224; see also *Greene v. Marin County Flood Control & Water Conservation Dist.* (2010) 49 Cal.4th 277, 287 [interpretation of a ballot initiative is reviewed de novo]; *City of San Diego v. San Diego City Employees' Retirement System*, *supra*, 186 Cal.App.4th at p. 78 ["[i]nterpretation of statutes, including local ordinances and municipal codes, is subject to de novo review"].)

C. *Proposition 162's Grant of Plenary Authority Includes the Authority for Retirement Boards To Adopt Employment Classifications and Employee Salaries*

1. *The Language, Purposes, and Intent of Proposition 162 All Show Retirement Boards Have Authority To Adopt Employment Classifications and Salaries for Their Employees*

While the trial court was bound by the court's holding in *Westly*, we are not. (*Copenbarger v. Morris Cerullo World Evangelism, Inc.* (2018) 29 Cal.App.5th 1, 11; see *Sarti v. Salt Creek Ltd.* (2008) 167 Cal.App.4th 1187, 1193-1194 ["there is no

30

horizontal stare decisis in the California Court of Appeal"].) Contrary to the court's decision in *Westly*, we conclude the plain language, purposes, and intent of Proposition 162 make clear a retirement board must have authority to hire the personnel the board deems necessary or appropriate to fulfill the board's "fiduciary responsibility for investment of moneys and administration of the system." (Cal. Const., art. XVI, § 17.) That authority includes determining the number and type of personnel required to do the job, as well as their compensation, which according to LACERA comprises more than 70 percent of its annual operating budget.[7]

### a.     *The Plain Language of Proposition 162*

We begin with the text of Proposition 162, which states: "Notwithstanding any other provisions of law or this Constitution to the contrary, the retirement board of a public pension or retirement system shall have plenary authority and fiduciary

---

[7]     We do not address the specific issue decided by the court in *Westly*, which was whether the Board of Administration of CalPERS had authority to "exempt its employees from civil service, to bypass the Controller's duty to issue warrants for the pay of employees, and to issue stipends, salaries, and other payments in excess of the amounts permitted by the Government Code." (*Westly*, *supra*, 105 Cal.App.4th at p. 1099.) The parties in *Westly* agreed those actions violated certain provisions of the California Constitution and Government Code governing CalPERS (see *Westly*, at p. 1103), and the court in *Westly* considered whether Proposition 162 gave the CalPERS board authority to take those actions anyway (see *id.* at p. 1100). The County and Board of Supervisors do not argue the LACERA Boards' proposed salary ordinances the Board of Supervisors rejected would have violated CERL.

31

responsibility for investment of moneys and administration of the system, subject to all of the following . . . ."  (Cal. Const., art. XVI, § 17.)  In interpreting a constitutional provision, ""'"our paramount task is to ascertain the intent of those who enacted it.  [Citation.]  To determine that intent, we 'look first to the language of the constitutional text, giving the words their ordinary meaning.'  [Citation.]  If the language is clear, there is no need for construction.  [Citation.]  If the language is ambiguous, however, we consider extrinsic evidence of the enacting body's intent."'"  (*Greene v. Marin County Flood Control & Water Conservation Dist.*, *supra*, 49 Cal.4th at p. 290; accord, *Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1037; *Tos v. State* (2021) 72 Cal.App.5th 184, 196; see *California Privacy Protection Agency v. Superior Court*, *supra*, 99 Cal.App.5th at pp. 722-723 [interpreting a statute enacted by ballot proposition].)  "To determine the scope and purpose of the provision we are interpreting, we look to the entire substance of the voter-enacted [measure], that is, we construe the words in question in context, keeping in mind the nature and purpose of the statute. . . .  The statements of purpose and intent in . . . an initiative measure may properly be utilized as an aid in construing the measure, but they do not confer power, determine rights, or enlarge the scope of the measure."  (*California Privacy Protection Agency*, at p. 723; see *Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 261-262 [citing as an interpretive aid the "findings and declarations" of an initiative that amended the California Constitution].)

If the language of a voter initiative is susceptible of more than one reasonable meaning, "'we may consider the ballot summaries and arguments to determine how the voters

32

understood the ballot measure and what they intended in enacting it.'" (*People v. Gonzales* (2017) 2 Cal.5th 858, 868; see *City and County of San Francisco v. County of San Mateo* (1995) 10 Cal.4th 554, 563.) "In cases of ambiguity we also may consult any contemporaneous constructions of the constitutional provision made by the Legislature or by administrative agencies." (*City and County of San Francisco*, at p. 563; see *Greene v. Marin County Flood Control & Water Conservation Dist., supra,* 49 Cal.4th at p. 290.) In construing constitutional provisions enacted by initiative, the voters' intent "'is the paramount consideration.'" (*Gonzales*, at p. 868; see *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 16-18 [the voters' intent is entitled to great weight].)

The phrases "plenary authority," "administration of the system," and "subject to" in the first paragraph of Proposition 162 describe the scope of the power granted to retirement boards. The "fiduciary responsibility" retirement boards have "for . . . administration of the system" also informs the interpretation of Proposition 162.

First, "plenary" in Proposition 162 means "'[f]ull, entire, complete, absolute, perfect, unqualified.'" (*Singh v. Board of Retirement* (1996) 41 Cal.App.4th 1180, 1190, fn. 9; see Webster's 3d New Internat. Dict. (2002) p. 1739 ["plenary" means "complete in every respect: absolute, perfect, unqualified"]; see also *Haaland v. Brackeen* (2023) 599 U.S. 255, 374 (dis. opn. of Alito, J.) ["The term 'plenary' is defined in one dictionary after another as 'absolute.'"].) Courts have interpreted "plenary authority" and "plenary power" to confer "complete, absolute, and unqualified power." (*Velasquez v. Workers' Comp. Appeals Bd.* (2023) 97 Cal.App.5th 844, 855; see *Stevens v. Workers'*

*Comp. Appeals Bd.* (2015) 241 Cal.App.4th 1074, 1094-1095; *Bautista v. State of California* (2011) 201 Cal.App.4th 716, 725; see also *City of Redondo Beach v. Padilla* (2020) 46 Cal.App.5th 902, 918 [constitutional provision granting charter cities "plenary authority" to set the timing of their elections may not be contravened without "explicit guidance from the Legislature"].) Thus, the plenary authority Proposition 162 grants to retirement boards for "administration of the system" is complete and absolute, subject only to the terms of Proposition 162 and judicial review. (See *Board of Retirement v. Santa Barbara County Grand Jury* (1997) 58 Cal.App.4th 1185, 1193 ["[p]lenary power does not mean unreviewable power"]; *Singh*, at pp. 1190, fn. 9, 1191 [same]; see also *Singh*, at p. 1192 ["the word 'plenary' was intended to mean that retirement boards would have the sole and complete power to invest their funds and to administer their systems, as opposed to being subject to direction from state and local legislative and executive bodies in these matters"].) In addition, a county retirement board must "administer CERL as enacted by the Legislature; the boards have no authority to act inconsistently with CERL." (*Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.*, *supra*, 9 Cal.5th at p. 1069.)

Second, we construe "administration of the system" within the context of Proposition 162 and consistently with the same or similar phrases in CERL. (See *People v. Tran* (2015) 61 Cal.4th 1160, 1168 [courts should construe similar statutes in light of one another, and when statutes are in pari materia[8] similar phrases

_____

8 "Statutes are considered to be in pari materia when they relate to the same person or thing, or class of persons or things,

34

appearing in each should be given like meanings]; *GRFCO, Inc. v. Superior Court* (2023) 89 Cal.App.5th 1295, 1310 [same]; see also *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 ["words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible"].) Subdivisions (a) and (b) of Proposition 162 both refer to the duty of retirement boards to use the assets of a retirement system to "defray[ ] reasonable expenses of *administering the system*." (Cal. Const., art. XVI, § 17, subds. (a), (b), italics added.) This phrase also appears in section 31595, which states the assets of a retirement fund must be held for the exclusive purposes of providing benefits and "defraying reasonable expenses of administering the system." (§ 31595, subd. (a).) Similarly, section 31580.2 requires retirement boards that appoint their own personnel to adopt annual budgets "covering the entire expense of administration of the retirement system." (§ 31580.2, subd. (a).) The Legislature enacted these statutory provisions before the voters enacted Proposition 162, and we presume the voters were aware of them. (See *Ruelas v. County of Alameda* (2024) 15 Cal.5th 968, 979 [the voters are "presumed to be aware of existing laws" when they enact an initiative]; *People v. Perez* (2018) 4 Cal.5th 1055, 1067-1068 ["[w]e presume the electorate, when it enacts an initiative, is '"aware of existing laws"'"]; *Professional Engineers in California Government v. Kempton*,

---

or have the same purpose or object. [Citation.] Such statutes should 'be construed together so that all parts of the statutory scheme are given effect.' [Citation.] 'Identical language appearing in separate provisions dealing with the same subject matter should be accorded the same interpretation.'" (*Kaanaana v. Barrett Business Services, Inc.* (2021) 11 Cal.5th 158, 175.)

*supra*, 40 Cal.4th at p. 1048 ["voters are presumed to have been aware of existing laws at the time the initiative was enacted"]; *Brookside Investments, Ltd. v. City of El Monte* (2016) 5 Cal.App.5th 540, 555 [voters who enact "constitutional amendments are presumed to have been aware" of existing statutes].)

The costs of "administering the [retirement] system" under CERL include the costs of compensating retirement system personnel. (See § 31522.5, subd. (c) ["the compensation of personnel appointed pursuant to this section [governing the retirement system of San Bernardino County] shall be an expense of administration of the retirement system"]; § 31522.9, subd. (d) [same for Contra Costa County]; § 31522.10, subd. (c) [same for Ventura County]; § 31522.11, subd. (c) [same for Orange County]; *Corcoran*, *supra*, 60 Cal.App.4th at p. 94 ["[s]alaries of the officers and employees appointed by the Retirement Board are costs of administering the Contra Costa retirement system which the system itself bears"].) And the LACERA Boards include this expense in LACERA's annual budget "covering the entire expense of administration of the retirement system" (§ 31580.2, subd. (a)). Indeed, the County and Board of Supervisors acknowledge CERL requires LACERA to budget and pay for its employees' compensation. Because the phrase "expenses of administering the system" in Proposition 162 includes expenses for compensation, the phrase "administration of the system" must also include the management of compensation-related matters, such as fixing compensation for system employees. (See *Gilb v. Chiang* (2010) 186 Cal.App.4th 444, 465, 467 [statute granting authority to an agency to "administ[er]" state employees' salaries delegated authority to

36

that agency "'to manage or supervise the execution, use, or conduct'" of "'the state's financial relationship with its employees'"]; Webster's 3d New Internat. Dict., *supra*, at p. 27 ["administer" means "to manage the affairs of"]; *id.* at p. 28 ["administration" means "performance of executive duties: management"].)  Otherwise, "administering" the system would mean something different under Proposition 162 and CERL.  (See *Ruelas v. County of Alameda*, *supra*, 15 Cal.5th at p. 979 ["we must 'try to harmonize constitutional language with that of existing statutes if possible'"].)

Finally, we interpret the phrase "subject to all of the following" as it applies to Proposition 162's subdivisions, which qualify the scope of a retirement board's plenary authority.  "The phrase 'subject to' is not synonymous with 'according to' or 'consistent with'; it means conditioned upon, limited by, or subordinate to." (*Swan Magnetics, Inc. v. Superior Court* (1997) 56 Cal.App.4th 1504, 1510; see *Erickson v. Aetna Health Plans of California, Inc.* (1999) 71 Cal.App.4th 646, 657.)  Thus, the subdivisions of Proposition 162 do "not necessarily denote a clash of provisions," and instead "merely show[ ] which provision prevails in the event of a clash."  (Scalia and Garner, Reading Law: The Interpretation of Legal Texts (2012) p. 126; see Garner, Dict. of Legal Usage (3rd ed. 2011) p. 616 ["subject to" introduces a "subordinate provision"].)  A retirement board's plenary authority is "subject to" the conditions enumerated in Proposition 162's subdivisions in that such authority is limited by those conditions, but not (as the court in *Westly* stated) defined by them.  (See *Westly*, *supra*, 105 Cal.App.4th at p. 1109.)  For example, subdivision (e) of Proposition 162 states in part the "retirement board of a public pension or retirement system,

37

. . . shall have the sole and exclusive power to provide for actuarial services in order to assure the competency of the assets of the public pension or retirement system."  (Cal. Const., art. XVI, § 17, subd. (e).)  This provision does not limit the retirement board's plenary authority to provide actuarial services, but instead requires a board exercising that authority to assure the competency of system assets.  (See *O'Neal*, *supra*, 8 Cal.App.5th at p. 1213 [retirement board "has been granted plenary authority over administration and investment decisions concerning the retirement system, subject to its fiduciary duties"].)  Read together, these phrases (a retirement board's "plenary authority" for "administration of the system" that is "subject to" the conditions enumerated in Proposition 162's subdivisions) mean a retirement board's authority to manage the retirement system includes establishing employment classifications and compensation, so long as that authority does not contradict the enumerated conditions.

This interpretation is further supported by the fiduciary responsibility Proposition 162 places on retirement boards to administer their systems.  Before Proposition 162, article XVI, section 17 of the California Constitution provided only that the "assets" of a retirement system were "trust funds" and that the "fiduciary of the public pension or retirement system" (in other words, trustees of the retirement boards) had certain duties to participants and their beneficiaries and had to discharge those duties prudently.  (Cal. Const., former art. XVI, § 17, subds. (a)-(d).)  Based on the law of trusts, the court in *City of Sacramento v. Public Employees Retirement System* (1991) 229 Cal.App.3d 1470 held a retirement board's fiduciary duty under Proposition 21 included an "'unwavering'" duty of loyalty to

38

the beneficiaries of the assets held in trust that the retirement board must exercise "'to the exclusion of the interest of all other parties.'" (*City of Sacramento*, at p. 1494.) That duty outweighed other duties of retirement boards, such as the duty to minimize employer contributions to the retirement system. (*Ibid.*; see Cal. Const., art. XVI, § 17, subd. (b).) The court stated this inferior duty "cannot be construed to require [the retirement board] to manage the retirement system in a way which would favor an employer over the beneficiaries to whom it owes a fiduciary duty." (*City of Sacramento*, at p. 1493.)

The amendments to article XVI, section 17 enacted by Proposition 162 made explicit the retirement board's "fiduciary responsibility" for *both* the "investment of moneys" and the "administration of the system." (Cal. Const., art. XVI, § 17.) Subdivision (a) of Proposition 162 more fully describes an aspect of that responsibility as the "sole and exclusive responsibility to administer the system in a manner that will assure prompt delivery of benefits and related services to the participants and their beneficiaries." (*Id*., § 17, subd. (a).) The court in *O'Neal* stated the duties of loyalty and prudence under the law of trusts "strongly parallel[ ]" provisions enacted through Propositions 21 and 162 and "protect against improper influence generally." (*O'Neal*, *supra*, 8 Cal.App.5th at p. 1209; see *City of Sacramento v. Public Employees Retirement System*, *supra*, 229 Cal.App.3d at p. 1494 ["'The trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary.'"].) This protection ensures a retirement board places the interests of the system's members and beneficiaries above all others, including the interests of the relevant executive branch and the

employers who contribute to the system.  (See Cal. Const., art. XVI, § 17, subd. (b).)

Although Proposition 162 did not expressly grant retirement boards authority to establish employment classifications and compensation for retirement system employees, section 5 of Proposition 162 states that the "provisions of this act shall be liberally interpreted to effect their purposes." (1992 Ballot Pamp., *supra*, text of Prop. 162, p. 71, § 5.)  And it is hard to see how a retirement board can fulfill its fiduciary responsibilities to "administer the system" and "over the assets of the . . . system" (Cal. Const., art. XVI, § 17, subd. (a)) without having authority to determine how those assets are used, including by determining the number and types of employees and the compensation required.  (See *Gilb v. Chiang*, *supra*, 186 Cal.App.4th at p. 463 [""[p]ublic agencies possess not only expressly granted powers but also such implied powers as are necessary or reasonably appropriate to the accomplishment of their express powers""]; *Cox v. Kern County Civil Service Com.* (1984) 156 Cal.App.3d 867, 873 [same]; see also *Mijares v. Orange County Employees Retirement System*, *supra*, 32 Cal.App.5th at p. 331 [interpreting Proposition 162 broadly to give a retirement board authority "to take whatever measures needed" to comply with its duty].)  For example, subdivision (d) of Proposition 162 requires the members of a retirement board to "diversify the investments of the system so as to minimize the risk of loss and to maximize the rate of return."  (Cal. Const., art. XVI, § 17, subd. (d); see *Flethez v. San Bernardino County Employees Retirement Assn.* (2017) 2 Cal.5th 630, 636 ["a county retirement board is 'required to administer the retirement system "in a manner to best provide benefits to the participants of the

plan"""].) To fulfill this duty, members of retirement boards must have authority to recruit, hire, incentivize, and reward employees with the requisite investment knowledge and experience to maximize returns for the participants and their beneficiaries and to create management structures to "efficiently and promptly provid[e] benefits and services to participants." (1992 Ballot Pamp., *supra*, text of Prop. 162, p. 70, § 3, subd. (d).) Proposition 162 also requires a retirement board to use system assets and to discharge its duties for limited purposes, including "defraying reasonable expenses of administering the system." (Cal. Const., art. XVI, § 17, subds. (a), (b).) Again, it is difficult to see how a retirement board can fulfill those duties without having control over all the expenses of administering the system, including the number and types of employees, as well as their compensation.[9]

Allowing a board of supervisors with very different responsibilities, priorities, and agendas to veto the employment classifications and compensation adopted by a retirement board frustrates the board's ability to fulfill its duties under Proposition 162 and undermines the fiduciary relationship between the retirement board and the system's participants and their beneficiaries. The Legislature acknowledged as much in amending section 20098, which governs CalPERS and the State

---

[9] Citing a 1987 Attorney General opinion, the County and Board of Supervisors argue retirement boards can set a budget "that accounts for costs that are not within their control." That opinion, however, concerned the "cost of services provided [to a retirement system] by other county offices and departments for the benefit of the retirement system," not the salaries of a system's employees, which, according to LACERA, is one of its largest budget items. (See 70 Ops.Cal.Atty.Gen. 277 (1987).)

41

Teachers' Retirement System (STRS), after the court's decision in *Westly*. Less than three weeks after that decision, a member of the Legislature introduced Senate Bill No. 269 to authorize the boards of CalPERS and STRS "to appoint and fix the compensation" for management-level employees. (Legis. Counsel's Dig., Sen. Bill No. 269 (2003-2004 Reg. Sess.) 4 Stats. 2003, Summary Dig., p. 434.) In enacting Senate Bill No. 269, the Legislature found and declared the ability of the boards governing CalPERS and STRS "to meet their fiduciary obligation [under Proposition 162] to their members requires that they be able to attract and retain employees in key senior executive and investment management positions with compensation that is consistent with the compensation paid to employees in other public retirement and financial service organizations." (Stats. 2003, ch. 856, § 1, subd. (d).) The Legislature also found and declared: "The express purpose of this act is to enable the Board[s] of [CalPERS and STRS] to attract and retain key personnel by empowering those boards to establish both appropriate classifications within the civil service for its senior executive and investment management employees and the compensation paid to those employees, competitive with the compensation paid to employees in other retirement and financial service entities, consistent with the holding of Westly v. Board of Administration, and notwithstanding the provisions of the Government Code that provide the State Personnel Board and the Department of Personnel Administration that authority." (Stats. 2003, ch. 856, § 1, subd. (e).)

The court in *Corcoran*, *supra*, 60 Cal.App.4th 89 applied the same reasoning in concluding a retirement board (and not the board of supervisors) was the "governing body" for the employees

42

the retirement board appointed under section 31522.1 for purposes of determining the level of retirement benefits for those employees. (*Corcoran*, at pp. 91-95.) The court stated: "Unless the [r]etirement [b]oard is the governing body as to its officers and employees it cannot ensure that it defrays only reasonable expenses of administration [as required by article XVI, section 17]. . . . The [r]etirement [b]oard is the governing body as to the officers and employees that it appoints, otherwise it would have abdicated its obligation to make administrative cost decisions consistent with its primary duty to the fund's participants and to their beneficiaries." (*Corcoran*, at pp. 94-95.)

The County and Board of Supervisors suggest that interpreting Proposition 162 as LACERA proposes (an interpretation we adopt) will allow a board to administer a retirement system "in any way it likes, free from the constraints of other laws." Such a concern is unwarranted. A retirement board's duties to maximize the rate of return and to incur only "reasonable" expenses, along with judicial review of its actions, ensure that boards will not over-compensate their employees. (Cal. Const., art. VXI, § 17, subds. (a), (d); see *Board of Retirement v. Santa Barbara County Grand Jury*, *supra*, 58 Cal.App.4th at p. 1193 ["Proposition 162 did not insulate pension boards from judicial oversight."]; see also *City of San Diego v. San Diego City Employees' Retirement System*, *supra*, 186 Cal.App.4th at p. 79; *Singh v. Board of Retirement*, *supra,* 41 Cal.App.4th at p. 1191.) Moreover, retirement boards that appoint classified personnel under section 31522.1 remain bound by the county's civil service or merit system rules. (See § 31522.1.)

Our interpretation of Proposition 162 is also consistent with the voters' intent and the stated purposes of Proposition 162. One reason the voters enacted Proposition 162 was "to preclude the legislative and executive branches from 'raiding' pension funds to balance the state budget." (*Board of Retirement v. Santa Barbara County Grand Jury*, *supra*, 58 Cal.App.4th at p. 1193; see *Singh v. Board of Retirement*, *supra*, 41 Cal.App.4th at p. 1192.) But voters more broadly intended Proposition 162 "to 'insulate the administration of retirement systems from oversight and control by legislative and executive authorities.'" (*City of San Diego v. San Diego City Employees' Retirement System*, *supra*, 186 Cal.App.4th at p. 79; see *Singh*, at p. 1192.) For example, one of Proposition 162's "Findings and Declarations" was that, "[t]o protect pension systems, retirement board trustees must be free from political meddling and intimidation." (1992 Ballot Pamp., *supra*, text of Prop. 162, p. 70, § 2, subd. (f).) And the "Purpose and Intent" of the initiative included giving "the sole and exclusive power over the management . . . of public pension funds to the retirement boards." (*Id.*, § 3, subd. (e).) Because retirement boards like the LACERA Boards already budgeted and paid for the salaries of their employees from those funds under section 31580.2, the voters intended Proposition 162 to give retirement boards "sole and exclusive power" over the amount paid to retirement system employees from public pension funds. Allowing a board of supervisors to encroach on that power by directing how many, what kind of, and how much a retirement board can compensate system employees could lead to precisely the type of "meddling"

44

Proposition 162 sought to prevent. (See *State Board of Education v. Levit* (1959) 52 Cal.2d 441, 462-463 [the Legislature improperly usurped the constitutional authority of the State Board of Education to select textbooks by imposing budget restrictions on the use of funds to purchase two selected textbooks].)

2. *The County and Board of Supervisors' Arguments, Which Rely Primarily on* Westly, *Are Not Persuasive*

Relying on *Westly*, a selective reading of Proposition 162's legislative history, and several distinguishable cases, the County and Board of Supervisors argue Proposition 162 granted retirement boards plenary authority over only "investment and actuarial services," which is what the court in *Westly* held. (See *Westly*, *supra*, 105 Cal.App.4th at pp. 1109, 1110.) The *Westly* court's interpretation of Proposition 162, however, was flawed, and as the ballot pamphlet for Proposition 162 shows, the voters intended to give retirement boards authority over how to spend all system assets, including on employee compensation. There are several reasons why this is so.

First, the court in *Westly* erred in interpreting the phrase "subject to all of the following" in the introductory paragraph of Proposition 162, an error the County and Board of Supervisors repeat. As discussed, that phrase indicates that, where a retirement board's plenary authority conflicts with a condition listed in one of Proposition 162's subdivisions, the subdivision controls. (See Scalia and Garner, Reading Law: The Interpretation of Legal Texts, *supra*, p. 126 ["*subject to* often introduces a provision that contradicts some applications of what

45

it modifies"].)  But the court in *Westly* stated, contrary to the meaning of "subject to," that "[t]he subdivisions serve to limit *and define* the authority and responsibility granted in the initial paragraph" of Proposition 162.  (*Westly*, *supra*, 105 Cal.App.4th at p. 1109, italics added.)  That reading makes the introductory paragraph's reference to "plenary authority" superfluous.  There would be no need for Proposition 162 to give retirement boards plenary authority over anything if the subdivisions defined the full scope of the retirement boards' authority.  Because we must "strive to give meaning to every word in a statute [or initiative] and to avoid constructions that render words, phrases, or clauses superfluous" (*Klein v. United States of America* (2010) 50 Cal.4th 68, 80; see *T-Mobile West LLC v. City and County of San Francisco* (2016) 3 Cal.App.5th 334, 351), the *Wesley* court's (and the County and Board of Supervisors') interpretation of "subject to" cannot be correct.

Construing a retirement board's authority to extend only to "investment and actuarial services" also renders superfluous the language in Proposition 162 that gives boards fiduciary responsibility for "administration of the system" and "exclusive responsibility to administer the system."  (Cal. Const., art. XVI, § 17, subd. (a).)  As stated, "administration of the system" encompasses paying salaries to employees of the retirement system; if it did not, retirement system salaries would be excluded from "the entire expense of administration of the retirement system" under section 31580.2, and counties where retirement systems appointed their own staff would have to pay salaries of retirement system employees out of their general funds.  Moreover, Proposition 162 refers separately to "investment of monies," "actuarial services," and "administration

46

of the system" in several provisions (Cal. Const. art. XVI, § 17, subds. (a), (d), (e), (g)), and those phrases "'are presumed to have different meanings.'" (*City of Palo Alto v. Public Employment Relations Bd.* (2016) 5 Cal.App.5th 1271, 1294; see *Walt Disney Parks & Resorts U.S., Inc. v. Superior Court* (2018) 21 Cal.App.5th 872, 879 ["it is our obligation to interpret different terms used by the Legislature in the same statutory scheme to have different meanings"]; *Campbell v. Zolin* (1995) 33 Cal.App.4th 489, 497 ["where the Legislature uses a different word or phrase in one part of a statute than it does in other sections or in a similar statute concerning a related subject, it must be presumed that the Legislature intended a different meaning"].)[10]

Second, the County and Board of Supervisors argue their interpretation of Proposition 162 is consistent with the history of Proposition 162. The County and Board of Supervisors again cite *Westly*, where the court stated that "the voter intent, evidenced by the published ballot materials, is that [Proposition 162] would give the [retirement boards] the authority to administer the

---

[10] The court in *Westly* concluded that, "with regard to administration of the system, [a retirement board's] authority is limited to actuarial services and to *the protection and delivery of the assets*, benefits, and services for which the Board has a fiduciary responsibility." (*Westly, supra*, 105 Cal.App.4th at p. 1110.) Even under this (incorrect) interpretation of Proposition 162, the phrase "protection . . . of the assets," from which salaries for retirement system employees are paid, would readily encompass hiring and compensating the staff necessary to maximize the rate of return and ensure the prompt delivery of benefits to members and their beneficiaries. (See Cal. Const., art. XVI, § 17, subds. (a), (d).)

47

investments, payments, and other services of CalPERS, but not the compensation of [its] employees." (*Westly*, *supra*, 105 Cal.App.4th at p. 1112.) But that's not correct. The argument against Proposition 162 in the ballot pamphlet stated: "PROPOSITION 162 ENDS TAXPAYER OVERSIGHT OF STATE RETIREMENT BOARDS. Last year, in the middle of a recession and a budget crisis, the PERS board voted to pay its top bureaucrat $110,000 a year. The State controller blocked this pay increase, but would have no authority to stop other outrageous salary hikes if Proposition 162 becomes law." (1992 Ballot Pamp., *supra*, argument against Prop. 162, p. 39.) The majority of voters who cast their ballots for Proposition 162 in spite of this argument must have believed the initiative gave retirement boards authority to establish the salaries of retirement system employees. (See *People v. Galambos* (2002) 104 Cal.App.4th 1147, 1162 [ballot arguments indicate the voters' beliefs and understandings about an initiative measure]; *McLaughlin v. State Bd. of Education* (1999) 75 Cal.App.4th 196, 218 ["the substance of the ballot arguments leads unwaveringly to the conclusion that voters believed" an initiative measure would have the described effects]; see also *California Medical Assn. v. Aetna Health of California Inc.* (2023) 14 Cal.5th 1075, 1087 ["[t]o the extent there are ambiguities in [an] initiative's language affecting its application to the case, we turn to 'extrinsic sources such as ballot summaries and arguments for insight into the voters' intent'"]; *Hi-Voltage Wire Works, Inc. v. City of San Jose* (2000) 24 Cal.4th 537, 596 (conc. opn. of George, C. J.) [ballot pamphlet analysis of an initiative measure indicated what "the voters reasonably would have believed" about the initiative].)

48

The court in *Westly* acknowledged the argument against Proposition 162, stating the argument "claims the Controller has blocked the pay increase of a 'bureaucrat,' but would not have the authority to 'stop other outrageous salary hikes if Proposition 162 [became] law.'" (*Westly*, *supra*, 105 Cal.App.4th at p. 1111.)  The court, however, gave no weight to the effect of that argument on the voters' understanding of Proposition 162 and pointed to the rebuttal argument in favor of Proposition 162 stating "the proposition's opponents [were] 'trying to mislead the voters.'" (*Ibid.*)  But this statement appeared at the beginning of the rebuttal and said *everything* the opponents argued was "mislead[ing]"; the rebuttal never responded directly to the opponents' argument Proposition 162 would remove the Controller's authority to stop "outrageous salary hikes."  (See 1992 Ballot Pamp., *supra*, rebuttal to argument against Prop. 162, p. 39.)  The rebuttal to the argument against Proposition 162 does nothing to negate the voters' belief Proposition 162 gave retirement boards authority to set salaries for retirement system employees.

The analysis of Proposition 162 by the Legislative Analyst in the ballot pamphlet confirms the voters intended to give retirement boards authority to determine how to spend system assets, including on employee compensation.  The Legislative Analyst stated Proposition 162 would continue the retirement boards' existing obligation to "pay reasonable administrative costs" of the retirement system and explained Proposition 162 would give the boards "complete authority for administration of the system's assets and for the actuarial function."  (1992 Ballot Pamp., *supra*, analysis of Prop. 162 by the legislative analyst, p. 37.)  The Legislative Analyst further stated "[g]iving complete

49

authority for administration of public retirement system assets to the governing boards could reduce oversight of these activities by state or local government." (*Ibid.*)  As discussed, we presume the voters were aware section 31580.2 required retirement boards that appointed their own personnel to budget and pay for those salaries from system assets.  (See *People v. Gonzales*, *supra*, 2 Cal.5th at p. 869.)  Thus, giving complete authority over such assets to retirement boards also gave retirement boards authority to determine how to spend system assets, including for salaries and other "reasonable administrative costs."  (See 1992 Ballot Pamp., *supra*, analysis of Prop. 162 by the legislative analyst, p. 37.)

Finally, the County and Board of Supervisors cite several cases they contend support their constrained interpretation of Proposition 162.  These include *Board of Retirement v. Santa Barbara County Grand Jury*, *supra*, 58 Cal.App.4th 1185, which considered whether a retirement board's "plenary authority" enabled it to evade a grand jury investigation (*id.* at p. 1193), and *O'Neal*, *supra*, 8 Cal.App.5th 1184, which addressed whether "the adoption of an amortization rate for unfunded liabilities which included a period of negative amortization violated state law and constitutional mandates" (*id.* at p. 1192).  Neither of these cases cited *Westly* or addressed the scope of Proposition 162 in the context of a retirement board's authority to establish employment classifications or allocate system assets for employee compensation.

The County and Board of Supervisors also claim *City of San Diego v. San Diego City Employees' Retirement System*, *supra*, 186 Cal.App.4th 69 is "in accord" with *Westly*.  It isn't.  The court in *City of San Diego* considered only whether the

50

San Diego City Employees' Retirement System could charge the city for the cost of pension service credits, even though the municipal ordinance that created the "purchase of service credit program" required employees to pay the full cost of any service credits they purchased. (*Id.* at p. 73.) The court cited *Westly* for the proposition retirement boards do not have authority "'to evade the law'" or over "matters within the purview of other branches of government," such as the "granting of retirement benefits," which was the "exclusive jurisdiction of the City." (*City of San Diego*, at p. 79.) Although the court in *City of San Diego* restated *Westly*'s holding "the board's plenary authority to administer the pension system was 'limited to actuarial services and to the protection and delivery of the assets, benefits, and services for which the Board has a fiduciary responsibility'" (*City of San Diego*, at p. 79), that restatement was not necessary to the court's holding.

### 3. *Proposition 162 Does Not Conflict with the County's Home Rule Authority*

The County and Board of Supervisors argue that the County has exclusive authority under article XI of the California Constitution to establish classifications and fix compensation for county employees and that interpreting Proposition 162 to give retirement boards that authority for retirement system employees conflicts with the County's authority. As stated way back in Section A of the Factual and Procedural Background, article XI, section 4 of the California Constitution provides county charters "shall provide for . . . [t]he fixing and regulation by governing bodies, by ordinance, of the appointment and number of assistants, deputies, clerks, attachés, and other persons to be

51

employed, and for the prescribing and regulating by such bodies of the powers, duties, qualifications, and compensation of such persons, the times at which, and terms for which they shall be appointed, and the manner of their appointment and removal." (Cal. Const., art. XI, § 4, subd. (f).)  Similarly, article XI, section 1, which applies to general law counties,[11] states that "an elected governing body in each county . . . shall provide for the number, compensation, tenure, and appointment of employees." (*Id.*, § 1, subd. (b).)  As also stated, section 31522.1 provides that staff appointed by a retirement board under that statute are "county employees."  Thus, the County and Board of Supervisors contend, LACERA's (and now our) interpretation of Proposition 162 "would amount to an implied repeal" of these sections of article XI and that such implied repeals are disfavored.  (See *Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1039.)

But the voters who enacted Proposition 162 anticipated potential conflicts with other constitutional provisions, and the voters intended Proposition 162 to prevail.  Proposition 162 begins with the words, "[n]otwithstanding any other provisions of law or this Constitution to the contrary."  (Cal. Const., art. XVI, § 17.)  By using this phrase, the voters expressed their intent to have Proposition 162 """control despite the existence of other law which might otherwise govern."""  (*Klajic v. Castaic Lake Water Agency* (2004) 121 Cal.App.4th 5, 13; see *Arias v. Superior Court* (2009) 46 Cal.4th 969, 983 ["The statutory phrase "notwithstanding any other provision of law" has been called a

_____

[11]     The parties debate whether Article XI, section 1 applies to both general law and charter counties.  We need not resolve that issue.

52

"'term of art'" [citation] that declares the legislative intent to override all *contrary* law."']; *Golden Door Properties, LLC v. Superior Court* (2020) 53 Cal.App.5th 733, 762 [same]; Scalia and Garner, Reading Law: The Interpretation of Legal Texts, *supra*, p. 127 [the provision to which a "notwithstanding phrase[ ]" accords priority prevails], italics omitted.)  Thus, to the extent article XI, sections 1 and 4, might have encompassed employees appointed by a retirement board before the voters approved Proposition 162, the authority and independence the voters gave retirement boards in that initiative to establish employment classifications and salaries for their employees prevails.

Ordinary principles of constitutional interpretation support this conclusion.  "'[W]hen constitutional provisions can reasonably be construed so as to avoid conflict, such a construction should be adopted.  [Citations.]  As a means of avoiding conflict, a recent, specific provision is deemed to carve out an exception to and thereby limit an older, general provision.'" (*Greene v. Marin County Flood Control & Water Conservation Dist.*, *supra*, 49 Cal.4th at p. 290; see *Miller v. Superior Court* (1999) 21 Cal.4th 883, 892 [constitutional provisions "must be harmonized if possible"]; *San Francisco Taxpayers Assn. v. Board of Supervisors* (1992) 2 Cal.4th 571, 577 ["'a general provision is controlled by one that is special, the latter being treated as an exception to the former'"].)

The simplest way to harmonize Proposition 162 (i.e., article XVI, section 17) and article XI, sections 1 and 4, is to construe Proposition 162 to "carve out an exception" to article XI, sections 1 and 4, for the administration of retirement systems.  (*Greene v. Marin County Flood Control & Water Conservation Dist.*, *supra*, 49 Cal.4th at p. 290.)  Proposition 162

specifically addresses the administration of retirement systems and postdates Article XI, sections 1 and 4, by decades. The last sentence of article XI, section 1, which states a county governing body "shall provide for the number, compensation, tenure, and appointment of employees," originated in 1933, before the Legislature enacted CERL. (Cal. Const., former art. XI, § 5, added by initiative, Spec. Elec. (June 27, 1933), commonly known as Prop. 8.) Similarly, the substance of article XI, section 4, dates from a 1911 amendment that "authorized for the first time the framing of freeholders' charters for counties." (*Anderson v. Lewis* (1915) 29 Cal.App. 24, 27; see Cal. Const., former art. XI, § 7 1/2, subd. (5), now art. XI, § 4, subd. (f); *Dibb v. County of San Diego*, *supra*, 8 Cal.4th at p. 1207, fn. 3.) Thus, the much later and more specific constitutional provisions of Proposition 162 regarding the plenary authority and fiduciary responsibility of retirement boards over the administration of a retirement system limit the application of article XI, sections 1 and 4, to employees appointed by a county board of supervisors and not by a retirement board. (See *San Francisco Taxpayers Assn. v. Board of Supervisors*, *supra*, 2 Cal.4th at pp. 576-577 [more specific constitutional provision regarding limits on contributions to "'retirement' funds" took precedence over a more general provision regarding limits on "'debt service,'" even though "'the latter, standing alone, would be broad enough to include the subject to which the more particular provision relates'"]; *Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 372 [voter-initiated amendment abrogated prior interpretations of the constitutional right against self-incrimination].) "Such an interpretation gives effect to the intent of the voters in passing" the initiative. (*Izazaga*, at p. 372.)

Proposition 162's exception or carve-out to article XI, sections 1 and 4, is consistent with the scope of a charter county's home rule authority.  Article XI, section 4, gives the people in such counties authority "to create and operate their own local government and define the powers of that government, *within the limits set out by the Constitution.*" (*Dibb v. County of San Diego, supra,* 8 Cal.4th at p. 1206, italics added; accord, *San Bernardino County Board of Supervisors v. Monell* (2023) 91 Cal.App.5th 1248, 1275.)  Our interpretation applies the limits set out in Proposition 162 to the authority of charter counties to establish classifications and salaries for employees appointed by a retirement board.

Moreover, "charter county 'home rule' authority is limited to matters concerning the structure and operation of local government." (*Dibb v. County of San Diego, supra,* 8 Cal.4th at p. 1207; see *Coalition of County Unions v. Los Angeles County Bd. Of Supervisors* (2023) 93 Cal.App.5th 1367, 1388 ["the exercise of self-governance must be 'properly grounded on the county's authority to provide for the "powers and duties" of its local officers and the operation of local government'"].)  Although a county may create a retirement system by a vote of its board of supervisors (§ 31500), retirement systems are not county operations; they are independent entities established by state legislation and managed and administered by their boards, not by county boards of supervisors or any other county entity.  Indeed, a retirement board's constituency "is not limited to county employees, but may include employees of various political subdivisions and districts within the county." (*Traub v. Board of Retirement, supra,* 34 Cal.3d at p. 798; see § 31469 [defining "employee" for purposes of CERL].)  For example, LACERA

administers benefits and manages retirement funds for employees of the South Coast Air Quality Management District, whose jurisdiction covers multiple counties.  (See *Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 933, fn. 15.)  Thus, LACERA's operations exceed the operation of the County.  (See *Dimon v. County of Los Angeles*, *supra*, 166 Cal.App.4th at p. 1282 [under the "home rule" doctrine, county charter provisions "'*concerning the operation of the county*'" prevail over conflicting state laws]; *Holmgren v. County of Los Angeles*, *supra*, 159 Cal.App.4th at p. 601 [same].)  Cases cited by the County and Board of Supervisors for the proposition that "the *county,* not the state, not someone else, shall provide for the compensation of its employees" (*County of Riverside v. Superior Court*, *supra*, 30 Cal.4th at p. 285) are inapplicable because they do not involve employees appointed by a retirement board.  (See, e.g., *ibid.* [county probation department employees]; *Dimon*, at p. 1281 [same].)

If, as the County and Board of Supervisors argue, article XI, sections 1 and 4, gave counties exclusive authority to establish the terms and conditions of employment for employees of retirement systems, several provisions of CERL would be constitutionally suspect because an "express grant of authority to the county necessarily implies the Legislature does not have that authority."  (*County of Riverside v. Superior Court*, *supra*, 30 Cal.4th at p. 285; see *Dimon v. County of Los Angeles*, *supra*, 166 Cal.App.4th at p. 1281 ["The state constitution's express grant of authority to charter counties necessarily implies that the Legislature lacks the authority to provide for compensation of the County employees."].)  Article XI, sections 1 and 4, give county governing bodies authority to provide for the "appointment,"

56

"number," and "compensation" of county employees.  (Cal. Const., art. XI, § 1, subd. (b); *id.*, § 4, subd. (f).)  Article XI, section 1, also requires governing bodies to provide for the "tenure" of such employees, and article XI, section 4, requires governing bodies to provide for their "powers, duties, qualifications," "times at which, and terms for which they shall be appointed," and "the manner of their appointment and removal."  (*Id.*, § 1, subd. (b); *id.*, § 4, subd. (f).)

Adopting the County and Board of Supervisors' interpretation would create conflicts with various legislative grants of authority to retirement boards.  Such statutory conflicts would include (1) section 31522.1, which expressly gives retirement boards authority to "appoint" staff "as are required to accomplish the necessary work of the boards," and therefore impliedly gives them authority to determine the "number," "powers," "duties," and "qualifications" of their staff; (2) section 31522.3, which gives retirement boards in certain counties authority to "appoint" an assistant administrator and chief investment officer and to determine their "tenure" and "manner of . . . removal" by stating those employees "shall serve at the pleasure of, and may be dismissed at the will of, the appointing board or boards"; (3) section 31522.4, which gives LACERA authority to "appoint" certain staff members and to exempt them from "county charter, civil service, or merit system rules," thus affecting their "tenure," "terms for which they shall be appointed," and "the manner of their appointment and removal"; and (4) section 31580.2, which acknowledges retirement boards have authority to appoint their personnel

57

under section 31522.1.[12]  And regarding conflict (4), if retirement boards do not have authority to "appoint" staff under section 31522.1, the legislative bargain struck in AB 470 to give retirement boards this option in exchange for funding the administration of retirement systems from system assets would be nullified.[13]

The County and Board of Supervisors' reliance on section 31522.1, which states retirement board appointees shall be "county employees," is misplaced.  Several provisions of CERL

---

[12]    If the County and Board of Supervisors' interpretation of article XI, sections 1 and 4, were correct, section 25300, which mirrors those constitutional provisions, would also conflict with CERL.  (See § 25300 ["The board of supervisors . . . shall provide for the number, compensation, tenure, appointment, and conditions of employment of county employees."].)

[13]    For the same reasons, Proposition 162 does not interfere with the County Charter, which states the Board of Supervisors shall "appoint all . . . officers, assistants, deputies, clerks, attaches and employees whose appointment is not provided for by this Charter" and shall "provide, by ordinance, for the compensation of elective officers and of *its appointees*." (L.A. County Charter, art. III, § 11, subd. (1), italics added.)  The Charter also states the Board of Supervisors shall "provide, by ordinance, for the number of assistants, deputies, clerks, attaches and other persons to be employed from time to time in the several offices and institutions of the County, and for their compensation and the times at which they shall be appointed." (*Id.*, § 11, subd. (3).)  Employees appointed by a retirement board are not appointees of the Board of Supervisors, and LACERA is not an "office or institution" of the County.  (See *Traub v. Board of Retirement, supra*, 34 Cal.3d at p. 798; *Hudson v. County of Los Angeles, supra*, 232 Cal.App.4th at p. 396, fn. 2.)

58

make clear retirement system appointees are not "county employees" for all purposes. Instead, CERL gives retirement systems authority over their employees in a variety of employment contexts. Moreover, courts have found "county employees" who worked for a retirement system were also employees of that system. For example, as discussed, the court in *Corcoran, supra,* 60 Cal.App.4th 89 held a retirement board was the "governing body" for the employees it appointed for purposes of determining the level of retirement benefits for those employees. (*Id.* at p. 95.) Like LACERA, the retirement board in *Corcoran* appointed, promoted, and discharged its employees. (*Id.* at pp. 94-95.) As a result, the court in *Corcoran* held, that "those employees are members of the county civil service and paid according to county salary schedules with paychecks issued by the county is immaterial." (*Id.* at p. 95.)

For different reasons, the court in *Kern County Employees' Retirement Assn. v. Bellino* (2005) 126 Cal.App.4th 781 (*Kern County*) held an employee was employed by both the Kern County Employees' Retirement Association and its governing board, on one hand, and Kern County (by virtue of section 31522.1), on the other. (See *Kern County*, at pp. 787-790.) In that case a retirement association employee was elected to the board of the retirement association, but a statute precluded such employees from becoming board members without first resigning their position with the retirement association. (See *id.* at p. 786; § 53227, subd. (a).) The employee challenged application of that law to him, arguing that under section 31522.1 he was a "County employee" and not an employee of the retirement association. (*Kern County*, at p. 785.) The court disagreed and held under the common law test for employment—"[t]he right to control and

59

direct the activities of the alleged employee or the manner and method in which the work is performed"—the employee was also employed by the retirement association. (*Id*. at p. 790.) "Such a conclusion," the court stated, "would in no way undermine the role of counties as employers of retirement association personnel under section 31522.1." (*Id*. at p. 790; see also *Metropolitan Water Dist. v. Superior Court* (2004) 32 Cal.4th 491, 500 [employees on a private contractor's payroll were also water district employees for purposes of enrolling in CalPERS].) Thus, that CERL defines employees of a retirement system as "county employees" for limited purposes does not mean they are employees of the county for purposes of article XI.

> D. *CERL Requires the Board of Supervisors To Include the LACERA Boards' Employment Classifications and Salaries in the County's Eligibility List and Salary Ordinance*

Consistent with its plenary authority over the administration of the retirement system, LACERA argues section 31522.1 requires the Board of Supervisors to include in the County eligibility list and salary ordinance the employment classifications and salaries adopted by the LACERA Boards, just as the Board of Supervisors did from 1996 to 2018. We agree with LACERA's interpretation of section 31522.1 and that this mandate is necessary to fulfill the purpose and intent of Proposition 162.

1. *Sections 31522.1 and 31580.2 Give Retirement Boards Authority To Establish Employment Classifications and Salaries for System Employees and Require Boards of Supervisors To Approve Them*

As with an initiative approved by the voters, our goal in interpreting a statute is to adopt a construction that "'best gives effect to the Legislature's intended purpose.' [Citation.] In determining that intended purpose, we . . . 'consider first the words of a statute, as the most reliable indicator of legislative intent.' [Citation.] In doing so, we give the words 'their usual and ordinary meaning,' viewed in the context of the statute as a whole." (*Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1183-1184; see *Kim v. Reins Internat. California, Inc.* (2020) 9 Cal.5th 73, 83; *Myasnyankin v. Nationwide Mut. Ins. Co.* (2024) 99 Cal.App.5th 283, 290.) "'We must harmonize the statute's various parts by considering it in the context of the statutory framework as a whole. [Citation.] If the statutory language is unambiguous, then its plain meaning controls. If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history.'" (*Myasnyankin*, at p. 290; see *Kim*, at p. 83.)

As stated, section 31522.1 provides that retirement boards "may appoint such administrative, technical, and clerical staff personnel as are required to accomplish the necessary work of the boards. The appointments *shall be made from eligible lists* created in accordance with the civil service or merit system rules of the county in which the retirement system governed by the boards is situated. The personnel shall be county employees and

61

shall be subject to the county civil service or merit system rules and *shall be included in the salary ordinance or resolution adopted by the board of supervisors* for the compensation of county officers and employees." (§ 31522.1, italics added.) LACERA argues the italicized language creates a ministerial duty on boards of supervisors to include in county employment classifications and the salary ordinance the classifications and salaries adopted by retirement boards. We agree with the trial court's assessment this language is ambiguous regarding who creates the "eligible lists" from which a retirement board may appoint personnel and regarding whether "personnel . . . shall be included in the salary ordinance" creates a ministerial duty. And the language stating "personnel shall be county employees" further complicates the meaning of section 31522.1.

Reading the contested language in its context, in the context of CERL as a whole, and in light of the relevant legislative history, we conclude section 31522.1 requires the Board of Supervisors to include in County classifications and the salary ordinance the employment classes and compensation adopted by the LACERA Boards. First, section 31522.1 gives LACERA Boards authority to "appoint" staff who are "required to accomplish the necessary work of the boards."[14] Because retirement boards manage their retirement systems (§ 31520), they must have authority to determine what work is "necessary." Appointing staff to accomplish the necessary work must include, at a minimum, authority to determine job responsibilities and reporting relationships of the appointed employees. It follows that the language in section 31522.1 stating "[t]he appointments shall be made from eligible lists" must mean lists made by the

---

[14]     CERL does not define the scope of the appointment power.

62

retirement boards because boards of supervisors have no knowledge of or supervisory authority over the necessary work of retirement boards. Moreover, if the Legislature had intended retirement boards to make appointments from eligible lists created by boards of supervisors for county employees, the Legislature could have omitted the reference to such lists in section 31522.1. (See *San Diego Police Officers Assn. v. City of San Diego Civil Service Com.* (2002) 104 Cal.App.4th 275, 284 [rejecting the construction of a statute "merely to restate" the status quo].)

Similarly, the language of section 31522.1, that personnel appointed by a retirement board "shall be included in the salary ordinance or resolution adopted by the board of supervisors for the compensation of county officers and employees," creates a mandatory duty for boards of supervisors to include in the relevant county's salary ordinance the salaries adopted by a retirement board for its appointees. The alternative interpretation proposed by the County and Board of Supervisors, that this language merely reflected the status quo for every county employee at the time the Legislature enacted section 31522.1, would render that language meaningless. (See *Kemp v. Superior Court* (2022) 86 Cal.App.5th 981, 994-995 ["'In construing a statute we are required to give independent meaning and significance to each word, phrase, and sentence in a statute and to avoid an interpretation that makes any part of a statute meaningless.'"]; *San Diego Police Officers Assn. v. City of San Diego Civil Service Com.*, *supra*, 104 Cal.App.4th at p. 284 [same].)

The County and Board of Supervisors also argue the use of "shall" in section 31522.1 is permissive and not mandatory

63

because "the duty is discretionary if the entity must exercise significant discretion to perform the duty." But the duty LACERA identifies does not involve any discretion. Indeed, the whole point of LACERA's argument is the Board of Supervisors does not have discretion to fix the compensation for LACERA employees and must include in the eligible list and salary ordinance the classifications and salaries adopted by the LACERA Boards for their employees. (See *Schecter v. Los Angeles County*, *supra*, 258 Cal.App.2d at p. 393 [affirming an order granting a petition for writ of mandate ordering the Board of Supervisors to amend its salary ordinance to implement classifications adopted by the Civil Service Commission].) The County and Board of Supervisors' argument rests on the incorrect premise that the Board of Supervisors retains some authority to establish or reject these terms of employment.

Second, reading section 31522.1 to require boards of supervisors to adopt the classifications and salaries adopted by retirement boards makes sense in light of section 31580.2, which gives retirement boards authority to create their own budgets and to charge administrative expenses, including compensation, against their earnings. LACERA cannot create an accurate budget without knowing what it can and will pay the staff it appoints. (Cf. *Hicks v. Board of Supervisors* (1977) 69 Cal.App.3d 228, 235 ["[t]he fixing of the number of employees, the salaries and employee benefits is an integral part of the statutory procedure for the adoption of the county budget"].)

Moreover, because the funds to pay LACERA's staff come from retirement system assets and not County funds (and because the LACERA Boards and not the Board of Supervisors have fiduciary duties to LACERA members and their

64

beneficiaries), LACERA Boards must have control over LACERA's budget, including compensation. (See *Corcoran, supra*, 60 Cal.App.4th at p. 95 [a retirement board is the "governing body" for its employees, "otherwise it would have abdicated its obligation to make administrative cost decisions consistent with its primary duty to the fund's participants and to their beneficiaries"].)[15] The County and Board of Supervisors' position that the Legislature gave retirement boards authority to set their own budgets and hire their own employees so long as they paid those employees from system assets, yet silently reserved for county administrators the right to veto the vast majority of that spending, is inconsistent with retirement boards having the ability to create, fund, and control their own budgets. (See *Jackpot Harvesting Co., Inc. v. Superior Court* (2018) 26 Cal.App.5th 125, 141 ["we 'select the construction that comports most closely with the apparent intent of the Legislature [or the voters], with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences'"]; see also *Wasatch*

---

[15] Citing a 1987 Attorney General opinion, the County and Board of Supervisors argue the budgetary power section 31580.2 confers does not give retirement boards authority over personnel decisions. The Attorney General's opinion, however, was not contemporaneous with the enactment of AB 470 and addressed whether "the entire expense of administration of the retirement system" under section 31580.2 included certain costs (not including employee compensation) over which a retirement board has no control. (See 70 Ops.Cal.Atty.Gen. 277 (1987).) The opinion did not address whether retirement boards have authority over employee compensation under sections 31522.1 and 31580.2.

*Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1122
["[t]he court will apply common sense to the language at hand
and interpret the statute to make it workable and reasonable"].)[16]

Third, the legislative history of AB 470, though somewhat
thin on which body fixes compensation for retirement system
employees, generally confirms our interpretation. As discussed,
AB 470, which enacted section 31522.1, represented a tradeoff
that allowed retirement boards to appoint their own staff, so long
as they paid staff expenses, including salaries, from system
assets. The Legislative Counsel's Digest describes the bill as
permitting "personnel appointments by the board of retirement
and board of investment and provides that the expense of
administration of the retirement system up to a specified amount
shall be charged against the earnings of the retirement fund if
such appointments are made." (Legis. Counsel's Dig., Assem. Bill
No. 470 (1973-1974 Reg. Sess.) 1 Stats. 1973, Summary Dig.,
p. 39.) The Assembly Retirement Committee's bill analysis
observed that the Treasurer and Tax Collector of Los Angeles
County opposed AB 470. (Assem. Retirement Com., Analysis of
Assem. Bill No. 470 (1973-1974 Reg. Sess.).) Indeed, the
Treasurer and Tax Collector sent a letter to the Assembly
Retirement Committee stating the State Association of
Retirement Systems Administrators opposed AB 470 because it
would "remove[ ] budgetary responsibilities from the chief
administrative officer and the Board of Supervisors" and create

---

[16] Though we conclude the County has a ministerial duty to
approve LACERA salaries, we do not decide whether that duty
arises from the County's delegation of its salary-setting authority
after it voluntarily opted into CERL or from the displacement by
Proposition 162 of the County's home rule authority.

new units of county government (boards of retirement and investment) "with no cost controls as we now know them in county operations." (Treasurer and Tax Collector Harold J. Ostly, letter to Assemblyman Bob Wilson, Apr. 17, 1973.) The "cost controls as we now know them" apparently referred to the Board of Supervisors' control over LACERA's budget before the Legislature enacted AB 470. And the loss of that control was why the Treasurer and Tax Collector opposed the measure, which the Legislature enacted anyway.

The County and Board of Supervisors point to other excerpts of AB 470's legislative history to support their position section 31522.1 merely acknowledged the status quo for all county employees, i.e., that appointments must be made from existing eligibility lists and the County's salary ordinance. In particular, they point to the enrolled bill report prepared by an executive agency for the Governor before he decided whether to sign the bill. The enrolled bill report stated AB 470 would vest authority to appoint employees for the retirement system in retirement and investment boards, "subject however, to county civil service and salary fixing authority." (Agriculture and Services Agency, Enrolled Bill Rep. on Assem. Bill No. 470 (1973-1974 Reg. Sess.) prepared for Governor Reagan (July 5, 1973).) Enrolled bill reports, however, are not particularly probative of legislative intent because they are drafted after the Assembly and Senate have passed the legislation. (*In re Lucas* (2012) 53 Cal.4th 839, 856; *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 40-41.) As a result, enrolled bill reports may be "instructive," but they are not entitled to "great weight." (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 934, fn. 19; see *Conservatorship of Whitley* (2010)

50 Cal.4th 1206, 1218, fn. 3.) In any event, as the trial court observed, the enrolled bill report is "weak evidence of legislative intent" because it did not provide any analysis to support its reading of AB 470. Moreover, at the time, the Board of Supervisors made clear in its letter urging the Governor to veto AB 470 the Board believed the bill would remove the "cost controls" boards of supervisors had over retirement boards. (L.A. County Bd. of Supervisors, letter to Governor Reagan regarding Assem. Bill No. 470 (1973-1974 Reg. Sess.) July 10, 1973.) Thus, contemporaneous administrative analyses of AB 470 are essentially a wash and do not shed much light on the Legislature's intent. (See *Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 340 [extrinsic aids for interpreting an ambiguous statute include contemporaneous administrative constructions]; *Los Angeles Unified School Dist. v. Office of Administrative Hearings* (2023) 91 Cal.App.5th 208, 214-215 [same].)

Finally, and contrary to the County and Board of Supervisors' argument, the language of section 31522.1 stating retirement board appointments "shall be county employees" does not determine whether retirement boards or boards of supervisors have authority to classify and establish salaries for retirement system employees. The Legislature added this language to section 31522.1 in 1979, along with an amendment that increased the statutory limit on expenses for administration of the retirement system. (See Stats. 1979, ch. 55, § 1.) The latter amendment received most of the attention in the Legislature. Indeed, the Senate Public Employment and Retirement Committee report on Assembly Bill No. 132, which enacted the 1979 amendments, refers to the addition of "shall be county employees" to section 31522.1 as a "technical, clarifying

68

amendment[ ].”  (Sen. Com. on Public Employment and
Retirement, Rep. on Assem. Bill No. 132 (1979-1980 Reg. Sess.)
Mar. 19, 1979, p. 2.)  This is consistent with a letter from Contra
Costa County (which sponsored the bill)[17] stating the addition of
“[c]ounty employees” “makes it clear that the staff of [retirement
systems] *continues* to be county employees.”  (Contra Costa
County Treasurer Alfred P. Lomeli, letter to Assemblyman
Daniel E. Boatwright, Mar. 12, 1979, italics added.)  An enrolled
bill report, which “reflect[ed] the same understanding” (*Elsner v.
Uveges*, *supra*, 34 Cal.4th at p. 934), similarly stated “[t]he
language regarding retirement board employees is
nonsubstantive and is only intended to clarify their status.”
(Off. of Employee Relations, Enrolled Bill Rep. on Assem. Bill
No. 132 (1979-1980 Reg. Sess.) prepared for Governor Brown
(May 8, 1979) p. 1.)[18]

Designating retirement system employees as county
employees ensured such employees received the protections of the
civil service and could participate in the retirement system.  As

---

[17]    See Sen. Com. on Public Employment and Retirement,
analysis of Assem. Bill No. 132 (1979-1980 Reg. Sess.) Mar. 1,
1979, p. 1.

[18]    The County and Board of Supervisors also cite *Board of
Retirement v. Santa Barbara County Grand Jury*, *supra*,
58 Cal.App.4th 1185 for the proposition retirement system
employees are “county employees.”  The status of retirement
system employees, however, was not at issue in that case, and the
court merely paraphrased sections 31522.1 and 31580 in stating,
“The [retirement] Board’s staff are county employees, although
management of the system is vested in the Board.”  (*Board of
Retirement*, at p. 1191.)

69

the County counsel explained to the County chief administrative officer in 1996, "LACERA employees are made County employees by statute for rather limited purposes primarily relating to the manner of their appointment and their tenue.  Being County employees also allows them to participate in the retirement system and to receive county fringe benefits unless other benefits are established by the LACERA boards."  (See *Holmgren v. County of Los Angeles*, *supra*, 159 Cal.App.4th at p. 603 [subject to a few exceptions, "all classified County employees are automatically enrolled" in LACERA].)[19]  And as discussed, it is not unusual for a county employee to have two employers for different purposes.  (See *Kern County*, *supra*, 126 Cal.App.4th at pp. 787-790; *Corcoran*, *supra*, 60 Cal.App.4th at p. 95.)

> 2.      *County-specific Legislation Stating Retirement System Employees Are Not County Employees Does Not Undermine This Result*

The County and Board of Supervisors argue legislation enacted between 2002 and 2021 providing that certain or all employees of the retirement systems in Orange, San Bernardino, Contra Costa, and Ventura Counties are employees of their respective retirement systems shows the Legislature intended employees of retirement systems in other counties to be treated as "county employees" for all purposes.  This argument fails.

First, the Legislature enacted these statutes in response to or following the decision in *Westly* that wrongly interpreted

---

[19]     See also §§ 31468, subd. (*l*), 31522.5, 31522.7, 31522.9, 31522.11 (designating certain retirement systems "districts" under CERL for purposes of making their employees eligible to participate in the retirement association).

Proposition 162 and left retirement boards unable to independently manage their retirement systems. The legislative history of these statutes shows that problems recruiting and retaining retirement board staff led the retirement systems to seek this legislation. Second, that the Legislature enacted statutes redesignating certain "county employees" as employees of a retirement system indicates the Legislature never believed they were "county employees" under article XI of the California Constitution for all purposes in the first place. As discussed, the County and Board of Supervisors argue that article XI gives them exclusive authority over the terms and conditions of employment for county employees and that the Legislature cannot encroach on or delegate this authority. That the Legislature enacted legislation making retirement systems the employers for certain employees appointed under section 31522.1 suggests such persons were never "county employees" for all purposes under article XI. (See *County of Riverside v. Superior Court*, *supra*, 30 Cal.4th at p. 285; *Dimon v. County of Los Angeles*, *supra*, 166 Cal.App.4th at p. 1281.)

The relevant legislative landscape begins in 2001, when the Legislature enacted section 31522.4, which applies only to LACERA. That statute allowed LACERA boards to hire senior managers as at-will employees who are not "subject to county charter, civil service, or merit system rules." (§ 31522.4, subd. (a).) Such persons are still "county employees" whose positions "shall be included in the salary ordinance or salary resolution adopted by the board of supervisors for the compensation of county officers and employees." (*Ibid.*) According to the legislative history, the Legislature enacted section 31522.4 after the voters of Los Angeles County amended

the County Charter to exempt "the top two layers of management of all county departments from the county civil service system." (Sen. Public Employment and Retirement Com., Analysis of Sen. Bill No. 1132 (2001-2002 Reg. Sess.) as amended Apr. 18, 2001.)  Because "LACERA is an independent governmental agency separate from the county," it was not "included" in the scope of the Charter amendment.  (*Ibid*.)  At the time, LACERA, which sponsored the legislation (see *ibid*.), had no need to ask the Legislature to state explicitly that employees appointed by LACERA Boards were employees of LACERA or that the LACERA Boards could establish their employment classifications and salaries because LACERA and the County agreed Proposition 162 gave LACERA that authority.

In 2002 the Legislature added section 31522.5, which made certain senior management employees of the Orange County retirement system at-will employees subject to "terms and conditions of employment established by the board of retirement." (Former § 31522.5, subd. (b).)[20]  Although the legislative history does not state what prompted section 31522.5 at that time, the Orange County Employees Retirement System (OCERS) sponsored the legislation to ensure "the flexibility needed to recruit and retain specially trained pension professionals to assist them in carrying out their fiduciary responsibility of managing employee retirement funds."  (See Assembly Com. on

---

[20]    Since 2002 the Legislature has amended section 31522.5 several times, including to add the retirement system of San Bernardino County and to remove the retirement system of Orange County.  (See Stats. 2006, ch. 369, § 5; Stats. 2021, ch. 26, § 1.)  Section 31522.11 now applies to the retirement system of Orange County.

Public Employees, Retirement and Social Security, Analysis of Assem. Bill No. 1992 (2001-2002 Reg. Sess.) as amended Apr. 22, 2002, p. 1.)  Indeed, a letter from the OCERS chief executive officer explained OCERS had "recently lost its chief investment officer to a larger system when it was unable to create a flexible incentive program in a timely manner."  (Chief Executive Officer of OCERS Keith Bozarth, letter to Assembly Member Lou Correa, Apr. 23, 2002; see also Chief Executive Officer of OCERS Keith Bozarth, letter to Senate Member Nell Soto, June 3, 2002.)  Moreover, the trial court in *Westly* issued its decision against CalPERS in October 2001, and the bill that became section 31522.5 was introduced in the Assembly in February 2002.  (Cf. *Scott v. City of San Diego* (2019) 38 Cal.App.5th 228, 240-241 [appellate court decisions preceding a statutory amendment were relevant in determining the Legislature's intent].)  (As stated, in 2002 LACERA and the County agreed LACERA had the authority it needed to recruit and retain its staff by establishing employment classifications and salaries.)

In 2006 the Legislature applied section 31522.5 to the retirement system of San Bernardino County as part of "an omnibus technical bill," without much comment about that particular amendment.  (See Sen. Rules Com., Analysis of Sen. Bill No. 777 (2005-2006 Reg. Sess.) as amended June 15, 2006, p. 3.)  An enrolled bill report, however, stated the county was having "difficulty retaining and recruiting upper-level managers for the county retirement board because board employees are subject to civil-service salary restrictions.  Many managers leave the county once they obtain higher education or certification because the private sector often offers more lucrative salaries."  (Off. of Planning and Research, Enrolled Bill Rep. on

73

Sen. Bill No. 777 (2005-2006 Reg. Sess.) prepared for Governor Schwarzenegger (Aug. 23, 2006) p. 1; see *id.* at p. 2 [explaining the need for retirement systems "to offer competitive salaries to the employees that manage these crucial public retirement investments"].)  This concern was echoed in the legislative history of a 2009 statute that expanded the authority of the retirement system of San Bernardino County to additional categories of employees in section 31522.7.  (See § 31522.7, subds. (a)-(b) [giving the board of retirement of San Bernardino County authority to appoint a variety of employees who "shall be employees of the retirement system"].)  A Senate Rules Committee analysis stated employees of the San Bernardino County Employees' Retirement Association (SBCERA) were "obtain[ing] training and expertise at the expense of the Board of Retirement and then leav[ing] to take a better paying position with the counties."  (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1406 (2009-2010 Reg. Sess.) as amended May 21, 2009.)  The analysis said giving SBCERA authority to hire employees outside the county civil service system and classifying them as at-will employees would allow SBCERA "to better recruit qualified employees for these positions in a timelier manner."  (*Ibid.*)

In 2014 the Legislature enacted section 31522.9, which applies to Contra Costa County.  (§ 31522.9, subd. (h).)  Unlike the other county-specific legislation, section 31522.9 applies to all employees of the Contra Costa County Employees Retirement Association (CCCERA) "as are required to accomplish the necessary work of the board."  (*Id.*, subd. (a).)  Section 31522.9 followed a settlement agreement between CCCERA and Contra Costa County resolving a dispute that arose after the controller of

74

Contra Costa County refused to follow the CCCERA Board's direction to pay CCCERA employees, as the controller had in the past. (Sen. Public Employment and Retirement Com., Analysis of Sen. Bill No. 673 (2013-2014 Reg. Sess.) as amended Jan. 6, 2014, p. 3.)  Before the dispute, CCCERA and Contra Costa County appear to have agreed, as LACERA and the County had agreed at one time, section 31522.1 gave retirement boards authority to set salaries for their employees.  The legislative history of section 31522.9 states:  "Under existing law, the CCCERA Board has authority to establish compensation for retirement system employees, the Board of Supervisors has responsibility to establish civil service rules and enter MOUs for all county employees, and the Auditor-Controller provides payroll and oversight services."  (Sen. Public Employment and Retirement Com., Analysis of Sen. Bill No. 673, *supra*, p. 3.)  But after Contra Costa County's board of supervisors reduced the pay for county employees to reflect furloughs imposed on them, the controller "indicated that issuing full pay warrants to the CCCERA employees"—as the CCCERA Board directed—"would cause Contra Costa County to violate MOUs that prohibited disparate treatment among employees in the same class." (*Ibid.*)  (As stated, LACERA's employees are classified separately from County employees.)  CCCERA and Contra Costa County resolved their dispute through litigation and subsequent legislation that makes clear CCCERA employees are employees of the retirement system.

Finally, in 2015 the Legislature enacted section 31522.10, which gives the retirement system of Ventura County authority to appoint certain senior level managers as employees of the retirement system who are not subject to Civil Service Rules.

(§ 31522.10, subds. (a)-(b)(1).)  It appears from the legislative history the Ventura County Employees' Retirement Association (VCERA) was concerned about its ability to comply with its fiduciary duties under Proposition 162 following 2013 legislation that imposed new obligations on pension systems.  (See Sen. Com. on Public Employment and Retirement, analysis of Assem. Bill No. 1291 (2015-2016 Reg. Sess.) as amended May 27, 2015, p. 2.)  Thus, VCERA sponsored legislation to, among other things, "better equip[ ]" the VCERA boards "to carry out their fiduciary responsibility of managing employee retirement funds" by improving their "ability to recruit and retain specially trained staff with compensation that's competitive with the private sector."  (*Id.* at p. 4.)  The legislative history also includes a statement in support from the State Association of County Retirement Systems that the bill will create "a line of separation from the county administrative staff" to "ensure that the retirement system will have the unfettered ability to enforce [the new legislation]."  (*Id.* at p. 5.)

Each of these county-specific statutes followed or likely was precipitated by the litigation in *Westly*.  If the court in that case had decided that case differently, the county-specific legislation would not have been necessary because the "'administrative issues [that] continued to arise concerning terms and conditions of employment'" for retirement system employees would not have arisen.  (See Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 673 (2013-2014 Reg. Sess.) as amended Jan. 6, 2014, p. 4.)  Indeed, such issues did not arise between LACERA and the County until 2018, so that until then LACERA had no need for specific legislation to resolve any such issues.

Since 2018, the only new county-specific legislation is section 31522.11, which the Legislature enacted in 2021 to expand the categories of personnel OCERS can appoint as retirement system employees outside the civil service system. (See § 31522.11, subd. (a).) The legislative history of section 31522.11 demonstrates how *Westly* has led to legislative micromanagement of retirement systems, precisely what the voters intended to prevent by adopting Proposition 162. The Senate Committee on Labor, Public Employment and Retirement analysis of Assembly Bill No. 761 (which became section 31522.11) explained that existing law (then section 31522.5) limited OCERS to appointing as non-civil service employees "only one assistant administrator and require[d] all personnel of the OCERS investment Division to report directly to the OCERS Chief Investment Officer." (Sen. Com. on Labor, Public Employment and Retirement, Analysis of Assem. Bill No. 761 (2021-2022 Reg. Sess.) as amended Mar. 18, 2021, p. 2.) The analysis explained that OCERS believed that the scope of authority no longer met its "organizational needs" and that the bill "would 'allow for more efficient use of existing personnel' by allowing the OCERS board to appoint 'two assistant administrators . . . and to appoint a level of management personnel between the OCERS Chief Investment Officer and the other personnel in the OCERS Investment Division.'" (*Ibid.*)

This admittedly long and detailed detour into several rounds of legislative history shows how *Westly* has eroded the "plenary authority" of retirement boards to administer and manage their retirement systems. That OCERS had to seek a legislative amendment before it could restructure its management to be more efficient is contrary to the voters' intent

to free the administration of retirement systems from legislative and executive oversight.  (See 1992 Ballot Pamp., *supra*, text of Prop. 162, p. 70, § 3, subd. (e).)

In light of the court's holding in *Westly* and the difficulties retirement boards have had in recruiting and retaining staff under the constraints of county employment classifications and salary ordinances, that some retirement systems sought legislation to give them greater authority and flexibility is not indicative of the original intent of section 31522.1 or of its interpretation in light of Proposition 162.  The bureaucratic delays and disputes OCERS and other retirement systems experienced in attempting to manage their systems for the benefit of their members and beneficiaries are what led to this litigation.  Proposition 162 gave retirement boards authority and discretion to fulfill their fiduciary duties to maximize system assets and to charge against those assets reasonable administrative costs.  We must reconcile the language of section 31522.1 with Proposition 162, if possible (*Citizens Assn. of Sunset Beach v. Orange County Local Agency Formation Com.* (2012) 209 Cal.App.4th 1182, 1192), while acknowledging that, "if there is a conflict between the California Constitution and a law adopted by the Legislature, the California Constitution prevails" (*City and County of San Francisco v. Regents of University of California* (2019) 7 Cal.5th 536, 558).  The language and intent of section 31522.1 and Proposition 162 are reconciled by interpreting section 31522.1 to create a ministerial duty on the Board of Supervisors to include in the civil service classifications the positions adopted by the LACERA Boards and to include in the County salary ordinance or resolution the salaries for retirement system employees adopted by the LACERA Boards.

## DISPOSITION

The judgment is reversed.  The request for judicial notice is denied as unnecessary.  LACERA is to recover its costs on appeal.


SEGAL, J.


We concur:


MARTINEZ, P. J.


FEUER, J.